**Nathan WAREING, Through His Guardian Ad Litem, Teresa WAREING, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 93–6306–Civ.

United States District Court, S.D. Florida.

July 16, 1996.

Christian B. Nielsen, San Jose, CA, for plaintiff.

Wendy A. Jacobus, Assistant United States Attorney, Southern District of Florida, Miami, FL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCUS, District Judge.

THIS MATTER was tried without a jury before this Court on October 20, 23–24, 1995, November 15–17, 20–22, 1995, February 23, 26–28, 1996, April 15–19, 22, and concluded with closing arguments on May 28, 1996. Plaintiff Nathan Wareing, through his Guardian Ad Litem Teresa Wareing ("Plaintiff") brings this action[1] against Defendant United States of America ("Defendant") pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Plaintiff alleges medical malpractice in connection with the birth of Nathan Wareing on May 3, 1985 at the U.S. Naval Hospital in Guam. More specifically, Plaintiff says that the medical treatment that Teresa Wareing received between May 1, 1985 and May 3, 1985 fell below the applicable standard of care, and that the Government's breach caused Nathan Wareing to sustain permanent neurological injuries including, among other things, low I.Q., language disorder, attention deficit disorder, as well as other neurological deficits.

Upon a thorough review of the evidence and materials presented at trial, we conclude that Plaintiff has met his burden of demonstrating that Defendant breached a duty owed to Plaintiff, that the Government's medical staff badly mishandled Teresa Wareing's high risk labor and delivery, that Defendant's conduct was the cause of Plaintiff's injuries, and that Plaintiff suffered extensive damages. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law.[2]

### I. FINDINGS OF FACT

1. Plaintiff Nathan Wareing was born on May 3, 1985 at the U.S. Naval Hospital in

---

1. The Complaint also contained a claim for personal injury and intentional infliction of emotional distress by Teresa Wareing (Count II), and a claim for negligent infliction of emotional distress by Bruce Wareing (Count III). By *Order* dated May 18, 1995, the Court granted the Defendant's Motion to Dismiss these claims for lack of subject matter jurisdiction inasmuch as the claims were not properly raised administratively within the statutory time period. Thus, the sole claim that was tried was the one sounding in negligence alleging damages in connection with the delivery and care of Nathan Wareing.

2. The Court takes a moment to commend the attorneys for both parties for the vigor and quality of their representation.

Guam. He is presently eleven years old and resides with his mother and Guardian ad litem Teresa Wareing and his father Bruce Wareing in Florida.

2. The United States of America is the Defendant in this action.

3. Bruce Wareing, Nathan's father, was stationed at Anderson Air Force Base in Guam on active duty with the United States Air Force in 1985. *Trial Tr., Test. of Bruce Wareing,* November 15, 1995, at 17–18. Teresa Wareing, Bruce Wareing's wife and Nathan Wareing's mother, was in the active reserve at this time, and was in Guam as Bruce Wareing's dependent. *Trial Tr., Test. of Teresa Wareing,* February 27, 1996, at 125–26.

4. Teresa Wareing learned that she was pregnant in August 1984. She received prenatal medical treatment at the United States Air Force clinic through her fortieth week, and thereafter from the United States Naval Medical Center. *Id.* at 126. Teresa Wareing's medical records reflect that she had regular prenatal appointments between August, 1984 and her admission to the United States Naval Hospital on May 2, 1985. *Pl. Ex. 6,* Medical Records, at 15–20. Teresa Wareing's pregnancy was uneventful, and she testified that she did not have any significant medical problems from August 1984 to May 1985. *Trial Tr., Test. of Teresa Wareing,* February 27, 1996, at 130. Her estimated due date was April 8, 1985. *Id.* at 126.

5. The evidence establishes, however, that from May 1, 1985 until the delivery of Nathan Wareing on May 3, 1985, the Plaintiff received substandard medical treatment at the United States Naval Hospital on Guam. Among other things, the Defendant failed to recognize risks attendant to Teresa Wareing's high risk labor and failed to timely deliver her child. At the outset Defendant's physicians and other health care providers failed to appreciate the warning signs of this high risk pregnancy. According to the testimony of Dr. Oakes, one of Plaintiff's expert witnesses, an obstetrician/gynecologist with a subcertification in maternal fetal medicine or perinatology, the major risks associated with post-term pregnancies are "perinatal asphyxia, meconium aspiration and fetal distress

[and] birth trauma." *Trial Tr., Test. of Gary K. Oakes, M.D.,* February 26, 1996, at 24. Oakes testified that the Defendant failed to establish an adequate pattern of monitoring and surveilling fetal well-being after Teresa reached her 42nd week. The warning signals were magnified in this case, when at a prenatal examination of Mrs. Wareing on May 1, 1985, an ultrasound test revealed minimal amniotic fluid. *Pl.Ex. 17, Dep. of James Ray Beckham, M.D.,* at 17–19 ("as you scanned over the uterus and looked at the baby there was a subjective impression that the amniotic fluid was definitely decreased"), *Pl.Ex. 6, Medical Records,* at 15. Dr. Oakes, the director of perinatology and chairman of obstetrics and gynecology at Memorial Hospital Center in Savannah, testified specifically that the Defendant's health care providers failed to appreciate the high-risk nature of the Wareing pregnancy and failed to properly monitor it. Particularly after the ultrasound showed minimal amniotic fluid on May 1, 1985, Oakes opined that "she needed to be induced, not two days later as it was scheduled." That failure, he concluded, was a departure from the standard of care. *Trial Tr., Test. of Gary K. Oakes, M.D.,* February 26, 1996, at 84. Nevertheless, Dr. Beckham, the Navy's obstetrician who examined Teresa Wareing on May 1, 1985 concluded that he had a window of some 48 to 72 hours for safe delivery and decided to send Mrs. Wareing home until May 3, when, if needed, he would induce delivery. *Pl.Ex. 17, Dep. of James Ray Beckham, M.D.,* at 20. The Court specifically credits the testimony of Dr. Oakes.

6. Teresa Wareing began to have contractions at around 10:00 to 10:30 p.m. on the evening of May 1, 1985. *Trial Tr., Test. of Teresa Wareing,* February 27, 1996, at 140. Thereafter, as the contractions progressed, Mr. and Mrs. Wareing went to the United States Naval Hospital at around 11:00 a.m. on the morning of May 2, 1985. *Id.* at 142; *Trial Tr., Test. of Bruce Wareing,* November 15, 1995, at 26. Upon arrival at the hospital, Teresa Wareing was given an exam and was advised that she was only dilated to one centimeter and that she "should either go home and rest or go get some lunch, [because] it was going to be a long day...."

Trial Tr., Test. of Bruce Wareing, November 15, 1995, at 26–27. Upon returning to the Naval hospital in the afternoon of May 2, 1985, Teresa Wareing was seen by Lieutenant Michael Murphy, M.D., an obstetrician on assignment with the United States Navy, and was admitted as a patient at 3:30 p.m. in the afternoon. Pl.Ex. 18, Dep. of Michael A. Murphy, M.D., January 31, 1994, at 25; Pl. Ex. 6, Medical Records, at 21. Dr. Murphy was the primary obstetric provider for Mrs. Wareing until his watch was changed at 4:30 p.m., when Lieutenant Commander John Keyes, M.D. assumed the watch. Pl.Ex. 18, Deposition of Michael A. Murphy, M.D., January 31, 1994, at 27. Dr. Keyes's specialty was family practice. Id. at 28. Dr. Murphy backed up the primary care physician, and, upon review of the medical records, he noted that he issued an order at 7:15 p.m. on the evening on May 2, 1985 which directed that "Patient to be monitored, q–2 hours, if ambulating. If no labor, let patient sleep on postpartum. Seconal, 100 milligrams, PO, before sleep if needed tonight." Id. at 31; Pl.Ex. 6, Medical Records, at 21.

Notably, Dr. Murphy agreed with Dr. Oakes' opinion that decreased amniotic fluid or "oligohydramnios" in connection with a post-date pregnancy "bears concern" and "bears watching" and generally calls for heightened vigilance. Pl.Ex. 18, Dep. of Michael A. Murphy, M.D., January 31, 1994, at 39. Dr. Keyes also testified in his deposition that a post-date pregnancy raises concern and noted that he watched Mrs. Wareing "very closely" as he "watched all of the ladies on the labor deck closely." Pl.Ex. 20, Dep. of John Judson Keyes, III, February 11, 1994, at 42, 50.

7. One of the medical providers to Mrs. Wareing at the Naval hospital, Lieutenant Louise M. Therriault, a staff nurse on the labor deck, testified that it was, among other things, part of her duty to monitor the patient's condition and "report any untoward or suspicious-looking findings to the physician on duty." Pl.Ex. 21, Dep. of Louise M. Therriault, April 25, 1994, at 27. However, Nurse Therriault observed that it was not her practice to give any more attention to a post-date pregnancy than a non-post-date pregnancy, nor was there any heightened degree of monitoring of a woman who was post-date. Id. at 61–62.

8. Dr. Oakes testified and the evidence supports the finding that the Defendant failed to adequately monitor the information transmitted through the fetal heart monitor. The fetal heart monitor strips were an important piece of evidence presented in the case. Fetal heart monitoring measures the fetal heart rate, and in particular, the variability in the fetal heart rate, that is, small regular changes in the lapse of time from beat-to-beat. Good beat-to-beat variability suggests normal neurological function. The deeper the heart rate drops and the longer the deceleration lasts, the greater the risk of possible neurological injury to the fetus. Dr. Oakes testified that careful monitoring of the fetal heart monitor strips was especially important in this case because of Mrs. Wareing's post-term status and the finding of minimal amniotic fluid. Nurse Therriault made a notation at 1:15 a.m. on the morning of May 3, 1985 indicating a deceleration on the fetal heart monitor strip, and additionally noted that Mrs. Wareing was lying on her right side. Id. at 98. Teresa Wareing was thereafter moved to her left side with Nurse Therriault's assistance. Id.; see also Pl.Ex. 6, Medical Records, at the fetal heart strips 54570–54571. Nurse Therriault testified at her deposition that she did not recall reporting the deceleration to the physician in charge of Mrs. Wareing's care. Pl.Ex. 21, Dep. of Louise M. Therriault, April 25, 1994, at 105.

James E. Short, M.D., an obstetrician/gynecologist and head of the Department of Obstetrics and Gynecology at the Naval Hospital in Guam, testified at his deposition that it would constitute a breach of the standard of care for an obstetrician to fail to communicate or discuss with a family practitioner who was assuming the care of a patient the patient's medical condition, including whether she is a high-risk, post-term, or whether there is a decreased amount of amniotic fluid. Pl.Ex. 16, Dep. of Dr. James E. Short, M.D., September 28, 1994, at 3, 6, 7.

9. At 1:00 a.m. on May 3, 1985, Dr. Keyes made a decision to rupture Mrs. Wareing's

bag of waters or membranes (the amniotic sac) in order to stimulate the labor process and in order to attach a fetal scalp electrode so that a better heart rate tracing could be achieved. *Pl.Ex. 20, Dep. of John Judson Keyes, III,* February 11, 1994, at 66–68. Notably, at the time the membranes were ruptured, Dr. Keyes observed thick meconium. *Id.* at 68. In addition, Dr. Keyes made a notation in the chart indicating "poor variability" which refers "to the baby's heart beat in the beat-to-beat variability." This finding was made at approximately 1:00 a.m. in the morning of May 3, 1985. *Id.* at 69; *see also Pl.Ex. 6, Medical Records,* at the fetal heart strips 54564–54570. The finding of meconium and decreased variability at 1:00 a.m. were unequivocal signs that the fetus was in distress. No action, however, was taken. Dr. Keyes testified that he did not call Dr. Murphy at this time in order to tell him of his findings of thick meconium and poor variability. *Pl.Ex. 20, Dep. of John Judson Keyes, III,* February 11, 1994, at 72. Dr. Murphy said, however, that he would generally expect a nurse to advise a physician of decreased variability, and that he would expect if a clinical situation presented itself that exceeding the capabilities of a physician the physician would consult another physician with more expertise in the particular area. *Pl.Ex. 19, Dep. of Michael A. Murphy, M.D.,* September 28, 1994, at 9, 16. Dr. Murphy was not notified of Dr. Keyes' findings regarding the thick meconium and decreased variability prior to approximately 4:00 a.m. *Id.* at 19–20. Dr. Murphy indicated, however, that if he had been informed of these findings he would probably have proceeded with a cesarian section at that time. *Pl.Ex. 18, Dep. of Michael A. Murphy, M.D.,* January 31, 1994, at 75. Dr. Keyes' failure to contact Dr. Murphy, the obstetrician charged with Mrs. Wareing's initial care, was a particularly serious breach of the standard of care.

10. Dr. Murphy returned to the Naval hospital's labor deck at approximately 11:00 p.m. on the evening of May 2, 1985 in order to care for another patient and remained until about 1:30 a.m. in the morning of May 3, 1985. Dr. Murphy did not recall checking on the condition of Teresa Wareing and no notation in the medical records reflects that he examined her during this time period. *Pl.Ex. 19, Dep. of Michael A. Murphy, M.D.,* September 28, 1994, at 4, 11, 12. Although Dr. Keyes knew Dr. Murphy had returned to the hospital, he did not alert him as to his finding of thick meconium and poor variability in Mrs. Wareing's post-date pregnancy. *Pl.Ex. 20, Dep. of John Judson Keyes, III,* February 11, 1994, at 73. Indeed, Dr. Murphy testified that it was his recollection that between 7:15 p.m. and 4:30 a.m. he had no contact from the hospital concerning Mrs. Wareing's condition or care. *Pl.Ex. 18, Dep. of Michael A. Murphy, M.D.,* January 31, 1994, at 32.

11. Dr. Oakes opined that the failure of the medical providers to appreciate the significance of the finding of thick meconium was a breach of the standard of care. *Trial Tr., Test. of Gary K. Oakes, M.D.,* February 26, 1996, at 40. In addition, the failure of Dr. Keyes to communicate his findings of *thick meconium* and *decreased variability* to Dr. Murphy, the supervising obstetrician until sometime after 4:00 a.m. on the morning of May 3, 1985 likewise was a breach of the standard of care. *Id.* at 42. Dr. Short also testified that it would constitute a breach of the standard of care for a family practice physician monitoring a patient in labor to fail to advise the on-call obstetrician-gynecologist of a finding of thick meconium and minimal beat-to-beat variability after the rupture of membranes in a patient who is post-term and who had a finding of minimal amniotic fluid. *Pl.Ex. 16, Dep. of James E. Short, M.D.,* September 28, 1994, at 4. Dr. Oakes further testified that the findings of thick meconium and decreased variability at around 1:00 a.m. on the morning of May 3, 1985 plainly indicated fetal distress and "when the diagnosis of fetal distress is made, delivery needs to take place. That either needs to take place vaginally or it takes place by Cesarian section. If delivery does not take place in the face of fetal distress, that's a departure from the standard of care." *Id.* at 45. Thus, Dr. Oakes concluded that the standard of care required the calling of a cesarian section sometime between 1:15 a.m. and 1:45 a.m. on the morning of May 3, 1985, and the proce-

dure should be done within thirty minutes after it was called. *Id.* at 90–91. Dr. Oakes additionally noted that had Nathan Wareing "been delivered at 1:30, he would not have had any permanent sequelae." *Id.* at 93.

.12. The Defendant stipulated "that there was a deviation from the medical standard of care. . . . Specifically, defendant stipulates that its agents or employees at the Naval Hospital in Guam should have performed the cesarian section prior to 5:37 a.m. on May 3rd, 1985, and that the failure to do so constituted a deviation from the medical standard of care." *Def's Stipulation on the Issue of Standard of Care,* May 1, 1995 [D.E. 94]. In fact the record evidence strongly suggests, and this Court finds that the cesarian section should have been called for by approximately 1:15 a.m.

13. The evidence demonstrated the continued failure of Defendant's physicians and health care providers to properly monitor Teresa Wareing's pregnancy despite the medical warning signs. Dr. Keyes did not give Mrs. Wareing requested pain medication at 1:45 a.m. *Pl.Ex. 6, Medical Records,* at 32. Bruce Wareing recalled that they were told that Teresa's labor was progressing normally and that she was going to have the baby before long and that the nurse "didn't want to give any pain medication that might slow down the labor." *Trial Tr., Test. of Bruce Wareing,* November 15, 1995, at 48. Dr. Keyes testified, however, that he examined Mrs. Wareing at 1:47 a.m. and again at 2:40 a.m. on the morning of May 3, 1985 and the labor was not progressing. *Pl.Ex. 20, Dep. of John Judson Keyes, III,* February 11, 1994, at 82. In light of this situation, Dr. Keyes gave Teresa Wareing some demerol and phenergran at 2:40 a.m. to "try to help her to relax." *Id.* at 82–83. Bruce Wareing recalled that a nurse told them that Teresa could then have some pain medication because "there [were] other women having babies right at this moment and that they didn't mind if Teresa's labor did slow down some because there was only one doctor on duty and he was busy delivering other babies." *Trial Tr., Test. of Bruce Wareing,* November 15, 1995, at 57–58.

Dr. Oakes testified that Mrs. Wareing had an arrest of cervical dilation at eight centimeters from approximately 1:00 a.m. until the time of delivery at 5:40 a.m. He added that the failure to take action in view of the complete arrest of cervical dilation for more than four hours also constituted a breach of the standard of care in Dr. Oakes' opinion. Indeed, the failure of the cervix to dilate for more than two hours demands action because of the heightened risk of fetal injury. *Trial Tr., Test. of Gary K. Oakes, M.D.,* February 26, 1996, at 27–28. Dr. Short agreed that "[a] failure to progress in dilation at two hours during the active phase of labor is a situation which an obstetrician needs to evaluate for intervention and he needs to hear about this. . . ." *Pl.Ex. 16, Dep. of Dr. James E. Short, M.D.,* September 28, 1994, at 9.

14. Furthermore, upon reviewing the fetal heart monitor strips, as the labor wore on, Dr. Oakes opined that there was "ongoing fetal distress" occurring between 1:00 a.m. and 2:45 a.m. on the morning of May 3, 1985. *Trial Tr., Test. of Gary K. Oakes, M.D.,* February 26, 1996, at 48–49. The indications of fetal distress during this time frame included several decelerations and a decrease in variability according to the fetal heart monitor strips. *Id.* at 49. In Dr. Oakes' opinion, the lack of notations in the medical records concerning the signs of fetal distress during this time period were "profoundly abnormal," suggesting that the information from the strips was being ignored. *Id.* at 50. The significance of the failure to take appropriate action in view of the signs of fetal distress during this approximately hour-and-a-half time frame is that "the longer this goes on, the greater the risk for damage . . . brain damage." *Id.* at 51. Dr. Oakes testified that the findings from the fetal heart monitor at 2:45 a.m. were indicative or suggestive of perinatal asphyxia. *Id.*

The evidence further suggests that between approximately 2:45 a.m. and sometime after 4:00 a.m. of May 3, 1985 no medical provider checked Mrs. Wareing's condition. Dr. Keyes, the physician in charge of the labor deck, testified that he was attending to two other women who were in the process of

delivering their children, during this time. *Pl.Ex. 20, Dep. of John Judson Keyes, III,* February 11, 1994, at 129–143. Dr. Keyes specifically noted that he did not perform any examinations of Mrs. Wareing at this time because he "had to—I was in the labor—I was in the delivery room delivering two babies." *Id.* at 93. Nurse Therriault was assisting Dr. Keyes at this time. *Pl.Ex. 21, Dep. of Louise M. Therriault,* April 25, 1994, at 123. And the medical records do not reflect any entries during this time period. *Pl.Ex. 6, Medical Records,* at 32 and the fetal heart strips 54595–54614.

15. Carol Abrahams, a perinatal clinical nurse specialist called by Plaintiff rendered expert opinions as to the interpretation of fetal heart monitor strips, and the standard of care in obstetrical nursing. Nurse Abrahams testified that the nursing staff at Guam breached the standard of care by failing to properly monitor the progress of labor and, in particular, by failing to chart several decelerations of the heart rate. Moreover, Nurse Abrahams observed that there was no indication in the medical records that anyone had read or appreciated the significance of the results of the fetal heart monitor strips, notwithstanding that it would have been "hard to miss these profound decelerations," and it was hard to believe that someone was monitoring the strips but took no action. According to Abrahams, Mrs. Wareing was simply abandoned by the nursing staff.

At about 3:00 a.m. on the morning of May 3, 1985, a deceleration of some five minutes in duration, to as low as 60 beats per minute occurred which was charted on the fetal heart strips, and there is a handwritten notation that Mrs. Wareing was given six liters of oxygen. *Pl.Ex. 6, Medical Records,* fetal heart strips at 54596–54597. Nurse Abrahams testified that 60 beats per minute is about as low as an unborn baby's heart rate can go before death. Nurse Therriault testified that she did not make the notation and did not recognize the writing of the person who did. Nurse Therriault characterized what was happening at this time in the following terms: "[t]his is a rather prolonged deceleration of the fetal heart tone with a very slow return to baseline." *Pl.Ex. 21,*

*Dep. of Louise M. Therriault,* April 25, 1994, at 119–120. She agreed that this is the type of finding that should have been communicated to a physician, but she could not recall if this deceleration was in fact communicated to the supervising doctor. *Id.* at 120. From approximately 3:00 until 4:10 a.m. the heart strips show repeated decelerations and continued lack of beat-to-beat variability in Nathan's heart rate. Dr. Keyes testified that he did not think the nurses kept him properly informed about the status of Teresa Wareing's labor, and that if he had been made aware of the decelerations he would have called Dr. Murphy.

16. After Dr. Murphy returned to the hospital, he examined Mrs. Wareing and the fetal heart rate tracing and decided to do a cesarian section sometime at or after 4:00 a.m. on the morning of May 3, 1985. Dr. Murphy testified that his examination of the fetal heart strips revealed that "[t]here was low variability, and she had an episode of bradycardia." *Pl.Ex. 18, Dep. of Michael A. Murphy, M.D.,* January 31, 1994, at 53–54. The Court finds that there was a breach of the standard of care by failing to perform an immediate cesarian section even at this late hour. The medical records indicate that Bruce and Teresa Wareing signed a consent form for the cesarian section procedure at 4:10 a.m. in the morning of May 3, 1985. *Pl.Ex. 6, Medical Records,* at 66.

Dr. Oakes opined that according to the promulgated standard applicable in 1985 from the American College of Obstetrics and Gynecology ("ACOG") a cesarian section should actually be performed within 30 minutes of the decision to do the procedure. *Trial Tr., Test. of Gary K. Oakes, M.D.,* February 26, 1996, at 16, 46. And the failure to perform a cesarian section *within thirty minutes* of the decision being made would also constitute a breach of the standard of care. *Id.* Dr. Short and Dr. Murphy both testified that they attempted to comply with the ACOG standards in the course of their practice at the Naval Hospital. *Pl.Ex. 16, Dep. of Dr. James E. Short, M.D.,* September 28, 1994, at 14; *Pl.Ex. 18, Dep. of Michael A. Murphy, M.D.,* January 31, 1994, at 44. Dr. Short added that the hospital in

general also tried to meet the requirements of the ACOG standards. *Id.* at 15–16.

17. The medical records are equivocal as to the time the cesarian section was "called." The procedure may have been called as early as 4:10 a.m. on the morning of May 3, 1985, which was the time the Wareing's signed the consent form. *Pl.Ex. 6, Medical Records,* at 66. Alternatively, the procedure may have been called at 4:25 a.m., when there was a note that Teresa Wareing was catheterized. *Id.* at 32. Finally, the cesarian section may have been "called" as late as 4:40 a.m. according to Dr. Murphy's note. *Id.* at 28. Even assuming the procedure was called at the latest time indicated in the medical records, however, the medical records reflect, and there is no dispute among the parties that Nathan Wareing was delivered by cesarean section at 5:40 a.m. *Id.* Thus, the procedure was not completed for at least an hour, and perhaps as much as an hour-and-a-half past the time it was "called." This length of time constitutes a breach of the thirty minute ACOG standard of care. *Trial Tr., Test. of Gary K. Oakes, M.D.,* February 26, 1996, at 16, 46.

18. Nurse Therriault noted in the chart that at 5:00 a.m. on the morning of May 3, 1985 Teresa Wareing was taken to the operating room. *Pl.Ex. 6, Medical Records,* at 32. Dr. Oakes testified that from 5:00 a.m. until delivery "there is no fetal assessment done whatsoever ... and the fetal monitoring strips stop," thereby making it impossible to assess his condition. *Trial Tr., Test. of Gary K. Oakes, M.D.,* February 26, 1996, at 58.

19. Bruce Wareing testified that when Nathan was eventually delivered the doctor told him that "it was a boy and he had red hair" but that thereafter "things started going wrong." *Trial Tr., Test. of Bruce Wareing,* November 17, 1995, at 19. Mr. Wareing observed the pediatrician "talking a little faster" and saying "stat," and, after working on Nathan for a few minutes after birth, "took off running down the hall with the baby on a gurney and they took [him] to the nursery." *Id.* at 18. Some time later, after the delivery, Mr. Wareing saw Dr. Rick Weisser, a pediatrician, who, after examining Nathan, was the first physician to speak to Bruce Wareing. Dr. Weisser "explained to me that Nathan's blood gases w[ere] very far off and that he was very sick. And his words to me w[ere] that he didn't think Nathan was going to live, and if he did live, that he would probably be a vegetable." *Id.* at 21. Mr. Wareing observed Nathan in the nursery and noted that he had ace bandages on his legs, and I.V.s in his stomach, umbilical cord, and hand. He also saw that Nathan's hand was twitching, which was later explained to him as seizures. *Id.* at 24–25. In fact Nathan was near death when finally delivered at 5:40 a.m.

According to Mr. Wareing, the physicians in charge of Nathan's care had made a decision to medivac Nathan to a hospital in the Phillippines, the Navy Regional Medical Center at Clark Air Base. *Id.* at 23, 32. Dr. Yoder, a neonatologist, had flown in from the Phillippines and began to care for Nathan in Guam. Thereafter Dr. Yoder took Nathan on the plane, accompanied by Mr. Wareing, to the Phillippines about ten to twelve hours after Nathan was born. *Id.* 27. Immediately upon arrival in the Phillippines, Nathan was taken to the neonatal intensive care ward. *Id.* at 32–33.

20. The Defendant has not disputed that Nathan Wareing is neurologically impaired, or that brain damage is indeed evident in his radiological scans, or finally that delivery by cesarian section was untimely. Rather, it has vigorously contested that its negligence caused the Plaintiff's injuries, positing instead, principally through the testimony of its expert, Dr. Chalub, that one or more unidentified injuries or developmental defects *in utero* and prior to the 38th week of gestation caused Plaintiff's problems. Based upon a thorough review of all the evidence presented, however, the Court finds that Plaintiff has established by a preponderance of the evidence that Plaintiff's injuries were caused by the negligence of the Defendant's physicians and other health care providers who rendered care during Teresa Wareing's labor and delivery in Guam. We find that Plaintiff's injuries were sustained because of Defendant's failure to properly monitor and timely deliver the baby in view of the emerg-

ing fetal distress. The Plaintiff's injuries, were, more likely than not the result of an acute hypoxic ischemic insult to the brain, *i.e.,* a period of reduced oxygen and reduced blood flow which occurred while the mother was in labor, in the early morning of May 3, 1985. Moreover, the Court finds that if the Defendant had complied with the standard of care, the Plaintiff would not have sustained any permanent neurological damage and would not now suffer from the extensive cognitive, behavioral, psychological and neurological impairment he exhibits.

21. To establish causation the Plaintiff presented, among others, the expert testimony of Dr. Dieter Enzmann, a neurologist and expert in the diagnosis of brain injuries in infants, especially hypoxic insults and damage to the premature brain, and Dr. Ronald Coen, a neonatologist with extensive experience in caring for high-risk sick newborns. The Court found their opinions to be credible, persuasive, and particularly helpful in reaching its findings about causation.

Dr. Enzmann, a board certified radiologist, and Professor of radiology at Stanford Medical Center, who has taught and written extensively in the interpretation of radiological brain scans, and in connection with the imaging of hypoxic ischemic cerebral damage, explained that neuroradiology is a subspecialty of radiology which employs various imaging techniques to investigate the brain and spine, including computed tomography ("CT"), magnetic resonance imaging ("MRI"), X-rays, ultrasound, and like technologies. *Trial Tr., Test. of Dieter Enzmann, M.D.,* October 14, 1995, at 53–54.

Dr. Enzmann reviewed a number of medical records in this case, including a MRI scan dated 10/29/91 from Miami Children's Hospital, a CT scan dated 6/26/87 from the U.S. Air Force Base Keesler, a radiology report of a head ultrasound scan dated 5/20/85, and clinical summaries of care from Guam and Clark Air Force Base, as well as a number of letters from other physicians who have cared for Nathan or reviewed the case. *Id.* at 65. Based upon a review of these materials, Dr. Enzmann formed a clear opinion as to the type of injury that Nathan Wareing suffered—"a hypoxic ischemic injury to the brain." *Id.* at 66. "Hypoxic ischemic" means a lower blood flow and lower oxygen delivery to the brain. *Id.* at 76. A hypoxic ischemic injury, according to Dr. Enzmann, includes infarctions, demyelination, damage to axons, myelin pallor, and necrosis. *Id.* at 118–119. Dr. Enzmann also formed an opinion as to the timing of the injury sustained by Plaintiff. He observed that "this is an injury pattern indicative of a term infant. In the combination of the image tests with the medical history, I think this damage occurred in the perinatal time period." *Id.* at 66. The "perinatal time period" means "the time around birth, starting with labor, including birth and for 24 hours after birth." *Id.* Dr. Enzmann added that his review of the MRI and CT scans failed to reveal any evidence of a developmental disorder. *Id.* at 66–67. Nor did his review of the scans suggest that Nathan Wareing suffered from a metabolic disorder. *Id.* at 67–68. Dr. Enzmann additionally opined that there was no evidence of an injury caused by an infection in this case. *Id.* at 68.

22. Dr. Enzmann explained that he was able to date an injury based upon an MRI scan because brain injuries exhibit two major patterns detectible even years after the injury has been incurred. The first is a premature pattern, in which the injury is dated in the gestational age of twenty-eight (28) to thirty-two to thirty-four (34) weeks. The second pattern is seen in term infants, usually associated with the age range of thirty-eight (38) to forty (40) weeks or even later if the child is post-term. *Id.* at 69. According to Dr. Enzmann, in cases involving a hypoxic ischemic injury, "the patterns just differ between those two age groups when the injury occurs." *Id.* at 69–70. The premature pattern displays periventricular leukomalacia ("PVL") which "has a very particular pattern"—"abnormal white matter in a distribution right around the ventricles." *Id.* at 70.

Notably, Dr. Enzmann testified that the MRI scans and the CT scans taken of Nathan Wareing did not exhibit PVL. *Id.* "[T]he pattern that we see in PVL [ ] is different from what we see in this patient." *Id.* at 77. In reviewing the scans before the Court, Dr. Enzmann stated that "[t]hese le-

sions are not periventricular." *Id.* at 87. Dr. Enzmann noted that "PVL does not involve gray matter." *Id.* at 85; *see also id.* at 112· (noting that majority of brain damage involves the cortex and grey matter "which rules out PVL as far as I am concerned"). The scans reviewed by Dr. Enzmann revealed that Nathan Wareing suffered injuries to both gray and white matter. *Id.* at 84, 92. According to Dr. Enzmann, a very important diagnostic criteria indicative of PVL is damage to the fiber track adjacent to the ventricle in the atrial region of the brain. Yet in Nathan Wareing's case, the fiber track region is undamaged, "so it's another criteria that is against PVL." *Id.* at 88.

Dr. Enzmann further suggested that exposure to an intermittent or continual period of hypoxia significant enough to cause a brain injury four to five hours before birth was a clinical picture most consistent with Nathan's injuries. *Id.* at 77. Within a reasonable degree of medical probability, Dr. Enzmann concluded that the most probable timing of injury in this case, based upon his review of the scans and the clinical evidence, was some four to five hours before Nathan Wareing's birth. *Id.* at 122. Moreover, Dr. Enzmann noted that evidence of atrophy of the brain develops rapidly after incurring a hypoxic ischemic insult, from a day to seven days after the insult. After that time the atrophy progresses and becomes more obvious. *Id.* at 78. Dr. Enzmann testified that an ultrasound finding twenty (20) days after birth showing an enlarged left lateral ventricle would likewise be consistent with a hypoxic ischemic injury at the time of birth. *Id.*

23. Plaintiff also called Ronald W. Coen, M.D., a neonatologist, as an expert witness to testify concerning causation. Neonatology is a subspecialty of pediatrics and involves the care of high-risk sick newborns. Upon review of, among other things, various depositions, court testimony, and medical records from Guam, Dr. Coen likewise testified that Nathan Wareing suffered a hypoxic ischemic injury at or near the time of his birth, most likely because of umbilical cord compression caused by the lack of amniotic fluid. *Id.* at 14–15. Dr. Coen opined that "Nathan as a fetus entered labor in a stable condition. We

have no evidence that his brain had been insulted or injured prior to the labor process." In this connection, Dr. Coen noted that Nathan's head circumference and weight were normal for the gestational age that was measured, whereas "[a]s a general rule infants who are injured early in pregnancy usually do not grow normally." *Id.* at 18. Additional evidence suggesting that Nathan entered labor in stable and good condition included the non-stress test performed in April, 1985, which was within normal limits and "the early fetal heart rate tracings were described as good." *Id.* at 20.

Dr. Coen stated that the hypoxic injury "began sometime around the 1:00 o'clock hour in the morning on the 3rd and that is when we found the evidence of meconium in the amniotic fluid." *Id.* at 39–40. "When meconium is present in the amniotic fluid, this usually means that there has been a stress, such as hypoxic ischemic stress. The infant in response to the stress—and particularly term infants—will pass stool and begin gasping. This is in utero." *Id.* at 21. Dr. Coen further opined that neither an infection nor a genetic process played any role in Nathan Wareing's injury. *Id.* at 38. Upon his review of the medical evidence in this case, Dr. Coen observed that the early seizures and multi-organ failures after birth also indicate a moderate to severe hypoxic ischemic injury further suggesting a poor long-term neurological outcome. *Id.* at 49. Coen further explained that the Plaintiff's initial blood gas levels shortly after birth showed that he was significantly "acidotic," the result of insufficient oxygen, and that he also showed symptoms of damage to the kidneys, lung and heart, and seizures, which are frequently seen after hypoxic insult. The Plaintiff's initial recovery from hypoxia was complicated by meconium in his lungs, as well as persistent fetal circulation, a condition in which the pulmonary arteries fail to switch over to a life outside of the womb.

24. Ronald Cullen, M.D., a pediatric neurologist, was also called by the Plaintiff, to opine as an expert witness in the field of pediatric neurology. *Trial Tr., Test. of Ronald Cullen, M.D., February 26, 1996,* at 121. Dr. Cullen has treated Nathan Wareing since

1986. *Id.* at 124. Upon a review of the records and testimony in this case, as well as his own evaluations of Nathan Wareing on a frequent basis since 1986, Dr. Cullen, like Coen and Enzmann, opined that "Nathan has sustained . . . a hypoxic ischemic insult in the form of an encephalopathy to the brain, and that has left him over the years with a number of different neurological deficits." *Id.* at 127. Dr. Cullen further testified that an hypoxic ischemic insult is a permanent injury, *id.* at 129, and that the brain injury sustained by Nathan Wareing has affected his cognitive and intellectual abilities, his physiological development, his psychological development, as well as his motor functions. *Id.* at 130–131. In reaching this conclusion, Dr. Cullen stated that he ruled out "a structural or congenital defect in brain." Further, Dr. Cullen testified that Nathan Wareing's injury was "not genetic" because chromosomal testing had been done, and "[i]t was not infectious in that the records didn't reveal any intrauterine infection and the studies done indicated no changes in the brain that you would see with an infection like toxoplasmosis or rubella," and "[i]t was not traumatic in that there was no history in the records of severe abdominal trauma," and "it was not metabolic" in that chemical tests were performed. *Id.* at 153–54.

Moreover, the cause of the hypoxia that Nathan experienced was "related to a compromise of his fetal reserve during the hours of labor, cord compression, since the amniotic fluid was low and the cord compressed easy and there were variable decelerations, utero placental insufficiency with a decrease in flow of blood from the placenta through the cords of the baby, and then the effects of the meconium, which further comprised that flow of blood. And all of those things were occurring during the intrapartum period." *Id.* at 164. Dr. Cullen added that the time Nathan sustained this injury was "between approximately 1:00 o'clock in the morning up through the time of birth in a progressive and more serious fashion during that time." *Id.* Dr. Cullen explained that what he meant by "a progressive and more serious fashion" was that "when you get the compromise of fetal reserve and you continue to have repeated insults, that there is a summation effect, so that the second one, the third and the fourth all have a greater impact than if it was only one single episode." *Id.* at 164–65.

25. Several of Defendant's physicians at least implicitly concurred with the conclusions reached by Plaintiff's experts regarding the cause of Nathan Wareing's injuries. Dr. Hassel, a pediatrician who cared for Nathan Wareing at the Naval Hospital in Guam, as well as Dr. Bell and Dr. Yoder, the neonatologists who treated Nathan in the Phillippines, all appeared to agree that the cause of Nathan's problems was the result of asphyxia during labor. *Pl.Ex. 23, Dep. Rhett Hassell, M.D.,* April 26, 1994, at 45; *Pl.Ex. 26, Dep. Richard Bell, M.D.,* February 1, 1994, at 51, 77; *Pl.Ex. 25, Dep. Bradley Yoder, M.D.,* February 3, 1994, at 18, 66. Both Dr. Bell and Dr. Yoder testified that there was no medical evidence to suggest that Nathan Wareing's injuries were the result of any other syndromes, such as an infection, or metabolic or traumatic event. *Pl.Ex. 26, Dep. Richard Bell, M.D.,* February 1, 1994, at 87; *Pl.Ex. 25, Dep. Bradley Yoder, M.D.,* February 3, 1994, at 67. Dr. Weisser, who had known the Wareing's previously through church, met with Bruce and Teresa Wareing and "told them that there were some errors in judgment that were made in the care of her while she was in labor." *Pl.Ex. 24, Dep. Rick Weisser, M.D.,* February 1, 1994, at 57; *Trial Tr., Test. of Bruce Wareing,* November 17, 1995, at 21. Bruce Wareing testified that "Dr. Weisser told us that we had grounds for a lawsuit based upon the way Nathan—the delivery went with Nathan. . . ." *Trial Tr., Test. of Bruce Wareing,* November 17, 1995, at 49; *Trial Tr., Test. of Teresa Wareing,* February 28, 1996, at 22–23 (stating that Dr. Weisser told her that "that this should never have happened to Nathan" and explained that "Nathan and I were neglected; that Nathan should not have suffered what he suffered; that Nathan should have been delivered long before that ever occurred, long before he was actually delivered. It was not handled well by the medical staff. . . . I don't remember his exact words but our care was just very mismanaged. We were not taken care of.").

26. Dr. Barry M. Crown, a psychologist, testified for Plaintiff, and was received as an expert in the field of psychology and neuropsychology. *Trial Tr., Test. of Barry M. Crown,* October 23, 1995, at 1, 7–8. Dr. Crown opined that the cause of Nathan Wareing's neurological deficits, including attention deficit disorder, was his brain injury. *Trial Tr., Test of Barry M. Crown,* October 24, 1995, at 44.

27. In order to rebut the Plaintiff's theory of causation the Defendant presented testimony from Dr. Chalub, a pediatrician neurologist, who opined that Nathan's condition was due to one or more causes notably occurring *before* the thirty-eighth week of gestation rather than during the intrapartum period. Dr. Chalub opined that the severity of the condition called persistent fetal circulation experienced by Nathan Wareing after birth suggested a condition which had been ongoing for at least ten to fourteen days and not three to four hours prior to birth. Dr. Chalub also said that if there was a hypoxic ischemic insult in the intrapartum period he would have expected that Nathan Wareing could not walk or talk, and would have an inability to use his limbs, and manifest severe retardation. He noted that none of these symptoms are manifested in Nathan Wareing. Moreover, Dr. Chalub added that a finding of an enlarged left ventricle of the brain further supported his conclusion that something occurred during the *developmental* stage of the fetus and the brain rather than four to five hours prior to birth. Dr. Chalub further noted that the uniformly thin corpus callosum in the brain was also indicative of an injury which occurred earlier than three to five hours prior to birth. Dr. Chalub also said that the scans indicated the presence of periventricular leukomalacia ("PVL"), a condition which is caused by the deprivation of oxygenated blood flow to the brain during the twenty-eighth to the thirty-fifth week of gestation. Dr. Chalub added that the normal level of nucleated red blood cells found at birth suggests that a lack of blood flow to the brain at term was not the cause of the injury.

On cross-examination, however, Dr. Chalub stated that he did not know if Nathan Wareing suffered from a hypoxic ischemic insult before birth. Dr. Chalub further conceded that he found no chromosomal abnormality, no migrational disorder, and was unable to identify any infectious agent. Although Dr. Chalub maintained that the medical evidence suggested that Nathan Wareing suffered from a problem in the developmental stage, notably he was unable to say precisely what developmental problem may have occurred and, significantly, did not know the cause of the problem.

The Court considers the inability to identify a specific developmental defect, whether genetic, metabolic, traumatic, or infectious, to be significant. Plaintiff's experts, and particularly Drs. Enzmann and Coen, were able to opine, within a reasonable degree of medical probability, that Nathan Wareing's injuries were caused by a hypoxic ischemic insult occurring during the intrapartum period. Dr. Enzmann's expertise as a neuroradiologist in interpreting the relevant MRI, CT, and ultrasound scans was particularly convincing. Dr. Enzmann's reading and interpretation of the scans indicated a hypoxic ischemic injury at term, not a developmental defect prior to the intrapartum period.

Dr. Chalub's reliance upon a finding of an enlarged ventricle on the left side of Nathan Wareing's brain was undermined by Dr. Enzmann's testimony on this point too. Dr. Enzmann observed that a finding of a large ventricle does not indicate the presence of a developmental abnormality, noting that "when you damage brain tissue, the body resorbs that tissue, so the brain shrinks. Something had to take the place of that damaged tissue that is now removed. And what takes its place is water. And the water containing cavities in the brain are the ventricles. So they increase in size and take up the place of damaged brain." *Trial Tr., Test. of Dieter Enzmann, M.D.,* October 24, 1995, at 75. Indeed, Dr. Enzmann said that he would expect to see a large ventricle following a hypoxic ischemic injury. *Id.* Moreover, the Court is not persuaded by Dr. Chalub's finding of PVL in light of Dr. Enzmann's finding that the scans indicate that the great majority of the injury was sus-

tained in the subcortical white matter, not in the periventricular region. *Id.* at 111.

Finally, Dr. Chalub's finding of a small corpus callosum as an indicator of a developmental defect prior to birth was answered by Dr. Enzmann who testified that "[a]nything that destroys brain tissue can cause small corpus callosum. So if it's a premature insult, PVL can cause a small corpus callosum. If it's an insult at term, that brain damage can cause a small corpus callosum. It's a secondary phenomenon and related to brain damage." *Id.* at 115. Likewise Dr. Chalub's reliance on the normal finding of nucleated red blood cells taken shortly after birth was belied by the more convincing testimony of Dr. Coen, who opined that infants who are under chronic stress, or stress which has been ongoing for several weeks, will "raise their nucleated red blood cell count. Infants who are under acute stress, such as Nathan, I don't think had time to mobilize the bone marrow to produce the nucleated red blood cells and give the type of pattern greater than five or seven percent." *Trial Tr., Test. of Ronald Coen, M.D.,* February 27, 1996, at 113–114. According to Dr. Coen, if Nathan Wareing was suffering from chronic stress occurring weeks before his birth, his nucleated red blood cell count "should have been higher than noted." *Id.* at 115. In addition, Dr. Coen observed that medical studies have shown that not all children who experience a term hypoxic ischemic insult suffer from cerebral palsy, spasticity, severe mental retardation, or cortical blindness.

28. In sum, the overwhelming weight of the evidence including the testimony of Drs. Enzmann and Coen, the fetal heart tracings, the baby's severely depressed condition at birth, and Nathan's subsequent clinical course, which included symptoms of multiple organ damage and seizures, leads us to reject the Government's theory of causation as presented by Dr. Chalub. The greater weight of the evidence demonstrates and this Court finds that Nathan Wareing's current neurological condition and deficits are causally related to the failure to properly monitor and the delay in performing a cesarian section. We note again, Dr. Cullen testified that "[w]ithin reasonable medical probability had

he been delivered earlier, his injuries would have been considerably less." *Trial Tr., Test. of Robert Cullen, M.D.,* February 26, 1996, at 170. Dr. Cullen added that had Nathan Wareing been delivered by cesarian section at 1:30 a.m. in the morning of May 3, 1985, "[w]ithin a reasonable medical probability he would not have suffered from a permanent neurological injury and, at most, might show a mild problem in learning." *Id.* Dr. Cullen further opined that Nathan Wareing has attention deficit disorder ("ADD") which was "due to the brain injury that he sustained at the time of birth and the chemical changes that it produced." *Id.* at 173. Dr. Crown also testified that the cause of Nathan Wareing's attention deficit disorder was his brain injury and noted that ADD is a very common finding among children who are neurologically impaired. *Trial Tr., Test. of Barry Crown, M.D.,* October 24, 1995, at 44. Dr. Cullen testified that Nathan's attention deficit disorder is a condition that he will continue to suffer from for the remainder of his life. *Trial Tr., Test. of Robert Cullen, M.D.,* February 26, 1996, at 173. Dr. Cullen added that he was of the opinion that Nathan's "cognitive intellectual level and the range he is functioning at is as a result of the brain damage that he sustained during the intrapartum period at birth." *Id.* at 178. Dr. Cullen concluded that had delivery occurred at about 1:30 a.m., Nathan "would be functioning with a normal I.Q." *Id.*

29. Having found that Defendant plainly breached a duty of care and that its negligence caused substantial damages, any fair measure of damages includes a finding that the Plaintiff has suffered permanent neurological injuries that will essentially leave him functioning at the level of a ten to twelve year old level for the rest of his life. Nathan Wareing's I.Q., language abilities, social skills, attention and functional abilities have all been profoundly affected because of Defendant's negligence.

### A. I.Q. Testing

30. An examination of the evidence presented concerning the Plaintiff's I.Q. supports a finding that the Plaintiff sustained substantial neurological damage. Initial I.Q.

testing performed on Nathan Wareing in December, 1987 evidenced an I.Q. score of 72 on the Revised Stanford Binet test. *Def.Ex. 8*, at WH00035–36. This result fell "in the Borderline range, between Low Average and Mildly Mentally Delayed." *Id.* Subsequent testing at Miami Children's Hospital in March, 1988 revealed a one-year language delay on the Peabody Picture Vocabulary Test. *Id.* at WH00045.

31. Dr. Crown examined Nathan Wareing on four separate occasions. *Trial Tr., Test. of Barry Crown, M.D.,* October 23, 1995, at 9. Nathan obtained a full-scale I.Q. of 70 in the first test Dr. Crown gave in May, 1991. *Id.* at 18–19, 25. Dr. Crown noted that this score—70—on the full scale I.Q. test placed Nathan Wareing between the second and third percentile, meaning that roughly 97 out of 100 in his peer population would have an I.Q. greater than 70. *Id.* at 26. The normal range for this test is a score in between 85 and 115. *Id.* Subsequent tests resulted in full-scale I.Q. scores of 70, 74, and 70 respectively in 1992, 1993, and 1994. *Id.* at 49. One of Defendant's experts, Bonnie E. Levin, Ph.D., an neuropsychologist, tested Nathan's I.Q. in June, 1994 and he received a score of 64. (Dr. Levin, however, questioned the reliability of the score on the test she administered because she indicated that the score should have been similar to the scores obtained by Dr. Crown.)

Dr. Crown stated that the current definition of "educable retarded," according to the American Association of Mental Disabilities is a score of 74 or below on an I.Q. test. Based on this definition, Dr. Crown opined that Nathan's test scores placed him in the "educable retarded" range. *Trial Tr., Test. of Barry Crown, M.D.,* October 23, 1995, at 27. Dr. Crown concluded that "[t]he pattern that's emerged is ... that these problems, these impairments, are, indeed, permanent...." *Id.* at 51. Although Dr. Crown noted that Nathan will be able to acquire new knowledge as he ages, "the application of that knowledge will become more and more difficult for him. He will have the rote ability to acquire information, but will not have the ability to apply it." *Id.* Dr. Crown opined that based on his examination of Na-

than he did not believe that the Plaintiff would ever progress beyond the primary grade levels, or the third or fourth grade, in terms of educational achievement. *Id.* at 54. We found Dr. Crown's testimony to be credible.

### B. *Functional Abilities*

32. By any measure, the Plaintiff's level of functioning is significantly impaired. At the age of 10½, he can not tell time, does not know his address or telephone number, and can only occasionally recollect the city in which he lives. Nor can he consistently spell his name. In terms of Nathan's language abilities, Teresa Wareing testified that Nathan does not speak in a normal cadence, has fluency problems, and his speech is delayed in the sense that "[h]e has to think about what he is going to say." *Trial Tr., Test. of Teresa Wareing,* February 28, 1996, at 87–88. He can tie his shoes only loosely and exhibits substantial difficulty with personal hygiene, toiletry and brushing his teeth. He does not know the value of money and cannot tell the difference between a penny, a nickel, a dime or a quarter.

In connection with toiletry, Mrs. Wareing testified that "Nathan took a real long time to toilet train," and, although he was taught the use of the toilet, Nathan remains "really bad" at taking care of himself in the bathroom. Mrs. Wareing said that this meant that Nathan "urinates on the floor. He doesn't look where he is urinating in the bathroom. His underwear ha[s] a residue of stool most days." *Id.* at 90. Mr. Wareing testified that Nathan "doesn't clean up after himself" when he uses the toilet and has found that his underwear is frequently soiled. *Trial Tr., Test. of Bruce Wareing,* November 22, 1995, at 8. Mr. Wareing emphasized that both he and Teresa have continually been working with Nathan in order to improve his personal hygiene skills, but he has not significantly improved over the course of many years. *Id.* at 9. Mr. Wareing further said that they have to frequently clean up the bathroom because of Nathan's poor toiletry skills. *Id.* Mrs. Wareing added that Nathan also has difficulty in the area of dental hy-

giene. *Trial Tr., Test. of Teresa Wareing,* February 28, 1996, at 90.

Bruce Wareing further testified that Nathan is able to shower and bathe himself, albeit with supervision because

> [s]ometimes he can go in there and get it done. Sometimes he forgets to, you know, like wash his hair or whatever. A lot of times he will go in the shower or you tell him to go to the shower and you check five or ten minutes later and he is standing naked in the bathroom playing with something. And then when you get him in the shower, he will sit and play with the fog on the glass and he kind of forgets what he is in there to do. So sometimes he will go in there and he will do fine, and sometimes you got to keep checking on him to make sure that he is doing what he is supposed to be doing.

*Trial Tr., Test. of Bruce Wareing,* November 22, 1995, at 6. Mr. Wareing added that Nathan does not always observe social customs such as closing the door when using the bathroom and will sometimes falter in the area of personal modesty and fail to wear clothes after he comes out of the shower, even if family or company are in the house. *Id.* at 6–7.

33. Ronni Waldman, a senior teacher at the Easter Seals Society of Dade County, who taught Nathan Wareing in her class in 1994 and 1995, also testified that Nathan cannot write his name consistently because he sometimes leaves letters out. *Trial Tr., Test. of Ronni Waldman,* October 24, 1995, at 2, 4, 10. Ms. Waldman stated that Nathan does not know the value of a penny, a nickel, a dime, or a quarter. *Id.* at 11. Ms. Waldman added that Nathan can carry on a conversation, but his conversational skills are impaired inasmuch as "it's hard for him to stay on topics." *Id.* at 12. Nathan has also exhibited memory problems according to Ms. Waldman, who noted that "[w]e have to do many of the skills with constant repetition in order for him to retain information." *Id.* Moreover, the Plaintiff gets lost easily and must be watched closely for reasons of personal safety.

34. In connection with Nathan Wareing's current physical abilities, the evidence indicates that the Plaintiff has difficulty with eye-hand coordination and fine motor skills, and that he cannot keep up with other children his own age in regular sports activities. Bruce Wareing testified that Nathan was unable to keep up with a regular soccer program because the game was too fast for him. *Trial Tr., Test. of Bruce Wareing,* November 17, 1995, at 68–69. Mr. Wareing added that Nathan can not run as fast as other boys his age "[a]nd so when he tried to play soccer, he couldn't run as fast as the other kids, but I think more of a problem than running was trying to figure out where the ball was going. And he has to stop and think about things sometimes, and it just didn't work." *Id.* at 69.

35. Plaintiff also submitted evidence concerning Nathan's social development and social skills. In this regard, Dr. Crown observed that Nathan "had difficulties with visual memory" and auditory effect which has caused problems in "decoding" or discerning what facial expressions mean. *Trial Tr., Test. of Barry Crown, M.D.,* October 23, 1995, at 36. The effect of this deficit is that "[h]e didn't necessarily know when someone was angry or happy or sad, or so on." *Id.* The ability to decode visual and auditory messages "becomes even more significant as we go on in life because that forms the basis of our social interaction. It's important when we look at someone to know whether they are responding in a happy way or a sad way toward us, whether they are angry, whether they are provoked, and so on, to be able to discern feeling, not only in terms of facial expression, but also in terms of language tone and being able to pick up the tonal differences." *Id.* Dr. Crown further opined that when fully grown Nathan will only be able to achieve a social level within a pre-adolescent range around *10 years of age.* This meant, for example, that when Nathan is thirty-five years old, he will still have the social skills of a *10-year old. Id.* at 54–55.

There was significant credible evidence that Nathan Wareing's social development has been appreciably delayed, and that he does not act like a child of his age. Lawrence Forman, a rehabilitation/habilitation

counselor, called by Plaintiff as an expert in the field of rehabilitation and life care planning, *Trial Tr., Test. of Lawrence Forman,* November 15, 1995, at 2, 18, opined that Nathan does not have the social development of a child his age. *Trial Tr., Test. of Lawrence Forman,* November 20, 1995, at 31. Nathan's delayed social development was echoed by his teachers and therapists. Francine Weiner, a learning disabilities teacher with Davie Elementary School, testified that her review of Nathan's responses as a third grader "are very developmentally younger than many of the kindergartens that I test...." *Pl.Ex. 31, Dep. of Francine Weiner,* April 27, 1994, at 3-4, 136, 142. Lanette Robinson, a speech clinician at Davie Elementary School, added:

> By now the third grader should be able to write his name without missing a letter. He should be able to count at least to 100 by now. I think Nathan goes from one— The other day it was like one to twenty-four. He is inconsistent, Nathan. A normal third grader should be able to go to a special class and not need a buddy or a partner to go to the office and take his medication. We have to walk him with a messenger. A normal third grader should be able to, after learning going to a new school, find his way from here to there, to the cafeteria.
>
> As far as the classroom, it depends. Now there are some third graders in regular speech, but maybe they are not as severe. It depends on the skill they are working on. A normal third grader is a troublemaker. Nathan is really—I am talking about socially. Socially he is not aggressive enough. I am not saying that's his personality, but we have some third grade boys in here that are language delayed, but they are aggressive. Nathan chooses not to be with those third graders. He would play maybe with the first graders.... [Nathan's social level] is not third grade level.

*Pl.Ex. 32, Dep. of Lanette Robinson,* March 21, 1994, at 3, 120-21.

Perhaps most significantly, Dr. Cullen opined that he thought "ultimately Nathan will function between a ten and twelve-year-old age level." *Trial Tr., Test. of Robert Cullen, M.D.,* February 26, 1996, at 177. Dr. Cullen agreed that this meant that when Nathan is thirty or forty years old he would be functioning at the level of a ten to twelve year old. *Id.* The Plaintiff's experts added that the Plaintiff's defects will become more apparent as he gets older. Because the Plaintiff is unable to think abstractly, Dr. Crown opined that he will be locked into a child's level of concrete functioning. Indeed, in some areas the Plaintiff's cognitive functioning has plateaued and will not improve.

*C. Educational and Social Development*

36. The Court was further persuaded as to the extent of the damages suffered by Nathan Wareing by evidence of delay in Nathan's educational and social development. At the time of trial the Plaintiff, the age of a normal 5th grader, functioned at the kindergarten to first grade level. In this connection, Joan L. Borenstein, Ph.D., the Director of the Easter Seals Society, testified that she administered certain educational achievement tests to Nathan Wareing in the fall of 1994 and again in the spring of 1995. *Pl.Ex. 1, Easter Seal School Records.* Although the Plaintiff, enrolled as a student at the Easter Seals School since 1994, was between nine and ten years old when these tests were given, he scored at a less than first grade equivalent on the Kaufman math application and reading decoding tests. *Trial Tr., Test. of Joan Borenstein,* October 23, 1995, at 2, 10-12. A composite score of each of these educational achievement tests was "below 1.0" which is the lowest score one can get on the test. *Id.* at 11, 13.

Dr. Borenstein also gave Nathan the Peabody Individual Achievement Test Revised. This test also measures academic abilities covering a wide variety of areas, including reading, math, spelling, science, general information, and the like. Nathan was given the Peabody tests in 1994 and 1995, and scored between kindergarten and first grade level. *Id.* at 14-18. Other tests, including the Woodcock reading test and another math achievement test given by Dr. Borenstein were consistent with this level of academic achievement—an academic level between kin-

dergarten and first grade, although the Plaintiff was between nine and ten years old at the time. *Id.* at 18–20. Based on the testing conducted, she concluded, Nathan "did not acquire a significant amount of educational information or he had not improved significantly in any of the areas assessed." *Id.* at 20. Dr. Borenstein was unable to articulate a discrete explanation for Nathan's lack of progress:

> I believe it has to do with whatever impairments he has, and there were circumstances that did not allow him to learn in spite of the educational program that we administered.
>
> . . . .
>
> The learning problems that he has, the problems that he has in receiving information and in associating information and getting things down on paper and explaining things verbally are quite significant, and these prevented him from acquiring the knowledge that was being taught.
>
> . . . .
>
> In terms of output, his handwriting is extremely poor. His language, although it has improved, it was still very unintelligible in terms of articulation.
>
> But more important, his thought processes were not—didn't flow easily for him, and it was hard for him to explain things. That was how we could see the difficulties in receiving information because things had to be repeated, they had to be illustrated, they had to be explained. So there was a difficulty in processing this information, in receiving this information. And, of course, there was difficulty in processing, because we saw problems in making analogous relationships.
>
> There were also problems in some areas such as memory, and he could remember things for a short time and then forget them or remember them for a longer time and not remember them the following week.

*Id.* at 21–22.

Ronni Waldman further testified that in 1994 and 1995 Nathan was reading and performing math at a beginning first grade level. *Trial Tr., Test. of Ronni Waldman,* Oc-

tober 24, 1995, at 6–7. There was additional testimony presented as to the profound difficulties Nathan will face as he grows up, and as to his own awareness of his limitations. Dr. Crown testified that he was concerned about Nathan's social development in terms of knowing his "social place and social roles." *Trial Tr., Test. of Barry Crown, M.D.,* October 23, 1995, at 55. Dr. Crown was also concerned about the Plaintiff's ability in "dealing with sexual changes, sexual differences, and possible impulsivity and aggressiveness." Dr. Crown said that he "would be concerned about differences and changes in the ability to control emotional responsiveness and also control physical activity" as Nathan matures. *Id.* at 55.

Dr. Cullen took note of Nathan's immaturity and testified that Nathan "is already experiencing problems in Easter Seals with the friends he has made. They are progressing at a more rapid rate than he is, and so, therefore, they are leaving him in the—by the wayside and going and playing with their other friends. So Nathan doesn't have the same friends and has to continually go back to younger and younger children to play with." *Trial Tr., Test. of Robert Cullen, M.D.,* February 26, 1996, at 182. In this connection, Dr. Cullen further opined that "I think as he gets older he will become, indeed, more aware of his degree of deficits. I think some of the inappropriate behaviors, the anger we have seen will become worse." *Id.*

### D. *Measure of Damages—Past Expenses*

37. Plaintiff offered sufficient evidence that the Wareing's have incurred past expenses in an amount of $16,000.00, representing the past two years of schooling at the Easter Seals School. *Trial Tr., Test. of Teresa Wareing,* February 28, 1996, at 68; *Trial Tr., Test. of Joan Borenstein,* October 23, 1995, at 3 (stating that charge for tuition at Easter Seals School is $8,000.00 for the school year and that Nathan has been attending the Easter Seals School for the past two years). Indeed, the Government's experts both appeared to agree that Nathan had not received appropriate services in public school. At all events, the Court finds that the decision to place the Plaintiff in private

school was reasonable and that similar private education should continue in the future.

### E. Future Care and Services

38. The Court finds that because of the neurological injuries suffered by Nathan Wareing, he will require significant future care and services. The evidence plainly demonstrated, that Plaintiff will require medical evaluations, tests and procedures, and medicines, a variety of therapies, special private education and summer programs and later a supported employment environment when he reaches working age, rehabilitative equipment, as well as a variety of supervisory support care to assist him in living and managing his affairs. Indeed, both parties essentially agreed that the Plaintiff will require specialized education, various adaptive equipment, neuropsychological, psychological and behavioral assessments, yearly blood work, speech and occupational therapy, behavioral management therapy, family counseling, psychological testing, a case manager, and drug therapy, although the parties disagreed about the frequency of certain required therapies and evaluations. The parties disagreed, however, about the need for future living expenses and vocational services, and disagreed as to the extent of Plaintiff's lost earning capacity.

Plaintiff offered evidence of the future care and services Nathan Wareing will require through the introduction of a "life care plan" developed by its rehabilitation expert, Larry Forman. Without objection from Defendant, the final "life care plan" dated October 10, 1994 was received into evidence. Trial Tr., November 15, 1995, at 28–29; Pl.Ex. 4. As noted earlier, Mr. Forman is a rehabilitation/habilitation counselor who was accepted by the Court as an expert in the field of rehabilitation and life care planning. Trial Tr., Test. of Lawrence Forman, November 15, 1995, at 2, 18.

39. Mr. Forman testified that the formulation of a life care plan is not "an exact science," but it is generally designed to identify and prioritize the child's problems, make reasoned decisions in connection with addressing those problems, ultimately in order to lay out an approximate roadmap of the child's future. Id. at 23–24. Preparation of the life care plan, Mr. Forman indicated, included meeting with the child and the family, conducting a review of medical records, educational records, as well as consulting with doctors, psychologists, and teachers. Id. at 25. Mr. Forman specifically submitted the life care plan for Nathan Wareing to Dr. Crown, Dr. Cullen, and Dr. Borenstein for their review and to have them suggest any changes. Id. at 94. Mr. Forman added that the information he relied on in the preparation of a life care plan included looking at Nathan Wareing's age, his family and "position with other children," his education and parents' education, the medication he takes, how he spends his leisure time, his interpersonal skills, his medical condition in consultation with the assistance of physicians, his psychosocial and emotional well-being, his memory, and his physical capacities. Forman's analysis also includes "a very lengthy analysis of his activities of daily living, what he could do on his own, what he could do if mom and dad cued him, what he could do if mom and dad structured it, and what he needs people to help him do." Id. at 26–27.

The life care plan prepared by Mr. Forman is basically organized into broad categories of type of services, the age over which the services will be provided, the frequency, and the cost of the service or item. Much of Mr. Forman's life care plan is reasonable and carefully calibrated to the Plaintiff's plain needs. We detail those areas and categories proven by a preponderance of the evidence.

### 1) Therapeutic Evaluations

40. One category in the plan is called "evaluations therapeutic." Pl.Ex. 4, Life Care Plan, October 10, 1994, at 2. Under this heading, the life care plan formulated by Mr. Forman contains an initial recommendation "neuropsychological." This service is required from now until age fourteen, once a year, at a cost of $1,133.00. Mr. Forman explained that neuropsychological evaluations are needed "for management and educational program development" and in order "to help set bench marks for his progress." Trial Tr., Test. of Larry Forman, November 15, 1995, at 42. The need for neuropsychological

evaluations is grounded in Forman's consultations with physicians, including notably Dr. Crown and Dr. Cullen. *Id.* at 42–43. The price of the service was obtained by contacting providers and obtaining an average price in 1991 to 1994 dollars.[3]

A second subcategory included in "evaluations therapeutic" is *"occupational,"* which Forman concluded was needed by Plaintiff once a year from now until age fourteen, at a cost of $123.00. Mr. Forman testified that this is not occupational therapy itself, but rather is "an evaluation which will help ad- dress" the problems he is having with his hand-eye coordination and motor coordination. *Id.* at 44. The next five subcategories under "evaluations therapeutic" are *"speech," "psycho-social," "psychological," "psycho-educational,"* and *"vocational assessment,"* which Mr. Forman constructed in the same manner as "neuropsychological" and "occupational therapy evaluations." *Id.* These recommended services are reasonable and are detailed below in Table 1, which is derived from the life care plan. *Pl.Ex. 4, Life Care Plan,* October 10, 1994, at 2:

Table 1—Evaluations Therapeutic

| Evaluations Therapeutic | Age | Frequency | Cost Per Visit/Item |
| --- | --- | --- | --- |
| Neuropsychological | NOW–14 | 1 X YR | 1,133.00 |
| Occupational | NOW–14 | 1 X YR | 123.00 |
| Speech | NOW–21 | 1 X YR | 123.00 |
| Psycho-social | NOW–21 | 1 X YR | 233.00 |
| Psychological | NOW–21 | 1 X YR | 850.00 |
| Psycho-educational | NOW–21 | 1 X YR | 550.00 |
| Vocational assessment | At age 15 | 1 X | 750.00 |
| | At age 18 | 1 X | |
| | At age 21 | 1 X | |

2) *Laboratory Procedures*

41. The next category detailed in the life care plan is entitled "laboratory procedures." The first subcategory is "complete blood count (CBC) w/differential," two times a year for life at a cost of $74.66 per visit or item. The Defendant has not presented any convincing evidence that this is excessive or unnecessary.

3) *Medical Care*

42. The next category in the life-care plan is for "medical care." *Pl.Ex. 4, Life Care Plan,* October 10, 1994, at 3. "Medical care" differs from the evaluations section described, *supra,* in that "[a]n evaluation is a diagnostic tool used to determine a number of things," whereas "medical care" relates to the application of health care by a physician to treat various conditions. *Trial Tr., Test. of Larry Forman,* November 15, 1995, at 46. The recommendations for "medical care" are detailed in Table 2 below. The life care plan includes a limited number of other medical evaluations and diagnostic tests in addition to the items described here. *Pl.Ex. 4, Life Care Plan,* October 11, 1994, at 1.

---

**3.** The Plaintiff has not sought and is not awarded any recovery for the cost of any item character- ized by Mr. Forman as being "if needed," or "as needed."

Table 2—Medical Care

| Medical care | Age | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| Orthopedist/Physiatrist | NOW–14 | 1 X YR | 71.00 |
| Pediatric Neurologist | NOW–21 | 2–3 X YR | 86.00 |
| Neurologist | 22–Life | 1 X YR | 76.00 |

*4) Therapy*

43. The life care plan also categorizes a need for *"therapy" Id.* at 4. The first subcategory is for *"occupational therapy"* which is supplemental to the therapy Plaintiff now receives at the Easter Seals school, because of the need for additional therapy in a setting outside of school. *Trial Tr., Test. of Lawrence Forman,* November 15, 1996, at 48–49. *"Speech and language"* therapy is the next subcategory listed in the plan and Mr. Forman underscored the need for Plaintiff to continue to get the speech and language therapy he is already receiving in school, supplemented by an after-school program, "run by a speech pathologist who could teach him first through nonverbal communication and then through verbal communication how to speak in front of people, how to talk without interrupting them, how to wait for his turn, how to follow directions, how to listen carefully. . . ." *Id.* at 48–49.

Another subcategory includes "cognitive remediation," which, according to Mr. Forman, relates to thinking, judgment, impulse control and "knowing that you don't have to get somebody's attention by pulling their hair in certain settings." *Id.* at 51. Still another form of recommended therapy under the plan is a "behavior management program" which includes working with Nathan Wareing and his family regarding "setting reasonable limits" and guidelines for discipline in connection with Nathan's behavior. *Id.* at 51–52. Mr. Forman also recommended "individual counseling" to assist Nathan in working "out the rough edges [of social interaction] before he gets in big trouble." *Id.* at 52. The age, frequency, and costs of the "therapy" categories are detailed in Table 3.

Table 3—Therapy

| Therapy | Age | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| occupational therapy | NOW–14<br>AGE 15–18 | 2–3 HRS/WK<br>2 HRS/WK | 103.00/HR |
| speech and language | NOW–14<br>AGE 15–18 | 3–5 HRS/WK<br>1–2 HRS/WK | 103.00/HR |
| cognitive remediation ⌖ | NOW–18 | 2 HRS/WK | 103.00/HR |
| behavior management program | AFTER EVAL FOR 6 MOS | 1 HR/WK | 123.00/HR |
| individual counseling | BETWEEN AGE 12–16 FOR 1–2 YRS<br>AGE 21 for 6 MOS | 1 HR/WK<br>1 HR/WK | 123.00/HR |
| play therapy | NOW FOR 6 MOS–1 YR | 1 HR/WK | 123.00/HR |

⌖ To include auditory attention exercises, auditory discrimination exercises

#### 5) *Education and Training*

44. Turning next to "education and training" Mr. Forman testified that the life care plan contained two different recommended models—"model I" and "model II." *Id.* at 56; *Pl.Ex. 4, Life Care Plan,* October 10, 1994, at 5–6. Mr. Forman opined that Model I was the recommended option, and the Court finds that this is reasonable and warranted. The category of "education and training" is detailed at Table 4 *infra.* "Model I" specifically recommends that Nathan Wareing be specially educated in a private school. *Trial Tr., Test. of Lawrence Forman,* November 15, 1996, at 56. While the Defendant argued that the Plaintiff can obtain most of the educational services he needed in public school, the preponderance of the evidence suggests otherwise, and this Court finds under the facts of this case that Forman's recommendation is fair and reasonable. Mr. Forman considered the Easter Seals School, the school Nathan currently attends, and the Biscayne Rehab Institute which has recently opened. *Id.* at 58–59. The annual cost of private school special education from now until age-eighteen is $10,165.00.

Mr. Forman recommended that Nathan be placed in a private school because the public school is unable to service Nathan's particular needs as a brain injured child. Mr. Forman opined that although the public schools may be required to provide special education, he observed that "[t]he kids end up in various exceptional classes at other places. It's not a matter of them not wanting to, it's not a matter of them not trying to, it's just a matter of the system not being able to meet his individual needs and to reach the highest level of development that he could." *Id.* at 56–57. Mr. Forman added that he envisions Nathan attending school until the age of eighteen and then enrolling in a vocational program so that he may be employed at age twenty-one. Mr. Forman testified that although Nathan will "graduate" from high school he will not obtain a regular degree because he will never be able to pass the competency exams mandated by the State of Florida. *Id.* at 57–58. The recommendations for therapy and school placements in the life care plan, according to Mr. Forman, "will not increase his [Nathan's] intelligence level, but it will increase, without doubt, his level of functionality." *Id.* at 58.

With regard to the "vocational training" subcategory of "education and training," the life care plan recommends yearly training between the ages of nineteen and twenty-one at a cost of $6,500.00 per year. Mr. Forman explained that "vocational training" would encompass "[o]n-the-job training, supported employment in a vocational setting through initially what we call 'occupational training centers' and ultimately, if possible, through identified work sites in segregated areas." *Id.* at 60.

Mr. Forman next testified about the final two subcategories of the "education and training" category—"supported employment" or "sheltered workshop." The "supported employment" option envisions a cost of $3,267.00 for retraining two to three times over his lifetime from age twenty-one to sixty. *Id.* at 66. This cost is for "job coaches, job restructuring, job accommodations and job retraining." *Id.* The alternative "sheltered workshop" option recommends five days a week for fifty weeks per year at a cost of $30 a day from age twenty-one to sixty. Mr. Forman testified that the difference between "supported employment" and "sheltered workshop" is that "supported employment" is a "higher level of employment" in which wages are earned, whereas in "sheltered workshop" the participants "work on a piece level basis" at below minimum wages in addition to the costs per day for administration of the program. *Id.* at 68.

When asked to predict which of these employment models Nathan Wareing will be in, Mr. Forman testified in the following manner:

Optimistically I would love to see him in supported employment. That's what I am shooting for. That's what I hope he will make. Do I think it's 51 percent out of the 100 percent? No. I think it's more likely than not he will be in a sheltered workshop. Everybody doesn't agree with me. So I am going to go with the consensus of opinions and emphasize the supported employment. I think he will make it. I am just not sure he is going to be able to sustain it.

*Id.* at 62. Thus, although he thought Nathan might ultimately end up in sheltered workshop, he agreed with other opinions that Nathan may be able to be placed in a supported employment. Mr. Forman additionally opined that the pressures of productivity would likely mean that competitive employment would not be a viable option for Nathan. *Id.* The Court finds that "supported employment" option, the least costly of the two, is reasonable based on a review of all of the evidence in the case.

Table 4—Education and Training

| Education and Training—Model I | Age | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| special education (private school) | NOW–18 | YEARLY | 10,165.00/YR |
| vocational training | 19–21 | YEARLY | 6,500.00/YR |
| supported employment | 21–60 | 2–3 X [lifetime] | 3,267.00 |

*6) Support Care*

45. The next category in Forman's life care plan is entitled "support care" which is detailed at Table 5, *infra.* The life care plans contemplates that Nathan will live in the family home until age 21, and the first subcategory of services under "support care" is "respite care (child care specialist)." *Pl. Ex. 4, Life Care Plan*, October 10, 1994, at 7. Mr. Forman testified that this is intended to allow Plaintiff's mother to take some time off from caring for Nathan, one weekend every two months, at a cost of $12.50 per hour. *Trial Tr., Test. of Lawrence Forman*, November 15, 1995, at 76. Another subcategory of "support care" is for a "housekeeper" from now until age twenty-one for a half-day a week again in order to provide relief for Nathan's mother, who will be required to spend additional time attending to Nathan's needs. *Id.* at 76–77. This category is reasonable and grounded in the facts of this case.

The next subcategory listed under "support care" and by far the most expensive, is a recommendation by Mr. Forman that the Plaintiff be placed in an *"independent living facility"* which would provide for housing and shelter from age 22 through life at a cost of between *$280 and $317 per day.* The Plaintiff's life care plan also includes a subcategory entitled "case manager," which includes up to three hours a week at a cost of $60 an hour from age 22 throughout the rest of his life. Mr. Forman explained, and this Court is fully convinced that Plaintiff will need a "case manager" to oversee and coordinate "what needs to be done" in terms of assisting the Plaintiff with daily living. *Trial Tr., Test. of Lawrence Forman*, November 15, 1995, at 83–84.

While this Court is fully persuaded and finds that much of the services and items recommended in the Forman life care plan are reasonable and warranted for the Plaintiff, on the issue of future living arrangements, we remain unconvinced on this record that Plaintiff should be awarded about *$300* a day upon reaching 22 years of age for the rest of his life for an independent living facility. This recommendation was hotly dis-

puted by the Defendant. Plaintiff has not demonstrated by a preponderance of the evidence that this "living arrangement" will be required or that it will be most appropriate for Plaintiff. In the first place, the record evidence on the availability of the recommended facilities was largely unclear and unconvincing. The basis for the recommended expense of $280 to $317 daily is derived from information gathered from three independent living facilities, "Premier Rehabilitation," "CRAFSS," and the "Florida Institute of Neurologic Rehabilitation." *Pl. Ex. 4, Life Care Plan,* October 14, 1994, at 28. Of the three, however, Mr. Forman testified that he no longer believed that the Florida Institute of Neurologic Rehabilitation would be an appropriate placement for Nathan. *Trial Tr., Test. of Lawrence Forman,* November 16, 1995, at 103, 110. Forman also conceded that the Premier Rehabilitation facility, located in South Florida (Biscayne Bay), was primarily designed for post-acute brain injuries and may not be the most appropriate or even a viable placement for Plaintiff. Nor has Plaintiff convinced the Court, based on the record evidence, that a facility outside of South Florida would be either an acceptable or realistic option for the Wareings. Indeed, Mr. Forman acknowledged that the Premier Rehabilitation facility was designed at least in part to enable its residents to move back into the community, and that the goal of the facility was not to keep the individual institutionalized on a long term basis.

Moreover, the testimony concerning Plaintiff's appropriate placement at any of the three designated "independent living facilities" was limited. We note in passing that in Mr. Forman's previous draft recommendations concerning future living arrangements he recommended a "group home" at a cost of $1,355 monthly for life after age 22, rather than an "independent living facility." In his draft life care plan of February 4, 1992, for example, Mr. Forman was of the opinion that a group home—where a group of disabled individuals live together under supervision— was the most appropriate placement for Nathan. *Trial Tr., Test. of Lawrence Forman,* November 16, 1995, at 94–95. While Mr. Forman's opinion came to change on this

important matter, we are not satisfied on this record that an award of $280–$317 a day for life, amounting to an aggregate sum in excess of $3.7 million has been proven. Indeed, on cross examination, Mr. Forman still testified that "if I was to put him possibly in a group home that was consistent with his needs, it may not be inappropriate." *Id.* at 100.

We add that the testimony from Plaintiff's other experts witnesses—Dr. Crown, Dr. Cullen, and Dr. Borenstein—was decidedly equivocal and not altogether clear in so far as the life care plan recommended placement in an "independent living facility." Dr. Crown approved both the recommendation in the February, 1992 life care plan, which included a group home, and also signed off on the October, 1994 final life care plan which recommended an independent living facility. *Trial Tr., Test. of Barry Crown, M.D.,* October 24, 1995, at 28–29, 48. Dr. Crown did not offer specific testimony as to why an independent living facility was superior to or more appropriate than a group home, but rather testified to the generally unassailable proposition that Nathan will require a future living arrangement that includes supervision "[b]ecause he is going to need that type of support on a continuous basis. This is not something that he is going to achieve a spontaneous cure from." *Id.* at 48–49.

Another of Plaintiff's experts, Dr. Cullen, appeared to testify that an independent living facility was not the most appropriate placement for Nathan. Dr. Cullen said that he thought Nathan was going to require a significant amount of supervision of a type "usually seen in a group home" in a more "supportive environment than what's called an independent living facility." *Trial Tr., Test. of Robert Cullen, M.D.,* February 26, 1996, at 185. Dr. Cullen added that he believed that Nathan will require a significant amount of supervision as an adult because:

Nathan doesn't know how to manage money, he doesn't know how to manage his affairs, is not capable of making appropriate judgments, is immature and subject to be abused or taken advantage of by other people, not only emotionally, but physically. So for his well-being and to try and

provide him with as much opportunity to progress, he is going to need a very supervised program. And while the parents may provide as much as they can now, as he gets older he is suddenly now a 220–pound 19–year–old with the maturity of a 6– to 8– or ten–year–old, and they can't handle him. So he needs to be in an environment where they can work with him, where there is a case manager to take care of his needs, and obviously as a step towards where we, as parents, eventually aren't around any more.

*Id.* at 185–186. Finally, Dr. Borenstein testified that although she did not think that Nathan would not have to live in a group home as an adult, she thought Nathan "can live in a comparable situation to supported employment, and that's called supported living." *Trial Tr., Test. of Joan Borenstein,* October 23, 1995 at 80–81. Dr. Borenstein testified that Nathan will not likely require a group home setting but "will be able to achieve a living environment where he can have the support of a counselor or a facilitator." *Id.* at 81–82. Dr. Borenstein added that she "had no idea" whether she agreed with Mr. Forman's recommendation for a independent living facility at a cost of between $280 and $317 per day. *Id.* at 83. Dr. Borenstein stated that it was her opinion that provision of a case manager would be both valuable and necessary for Nathan Wareing. *Id.* at 83–84.

Finally, on this record, it is not at all clear that Nathan likely will move out of his family's home at 22, rather than at some later time. The most that Plaintiff brought to bear on this point was that Mr. Forman anticipated that Nathan would do so because it would be beneficial for him and for the Wareing family. While it may be reasonable to conclude that the Plaintiff may live outside the family home at some point in his lifetime, it is altogether unclear that he would in fact do so at age 22 for the balance of his life.

Defendant took the position that Nathan would be able to live independently or with the assistance of a roommate and some minimal supervision with a case manager. Both Dr. Wilhelm and Dr. Levin were of the view that Nathan Wareing would have the functional ability to eventually live independently. At the same time, however, both of Defendant's experts, as well as Plaintiff's experts, concurred that Nathan has significant deficits which would necessitate some level of support, training, therapy, and, ultimately supervision over his daily life. While we find that Plaintiff has failed to meet his burden of showing that an "independent living facility" at $280–317 daily is warranted, we do conclude that Nathan will require significant supervision over his living arrangements. We observe that Mr. Forman was of the opinion that Nathan "has to be [ ] as close as possible to a normal environment ... with the right kind of safety net, with the right kind of specialist." *Trial Tr., Test. of Lawrence Forman,* at 99–100. Defendant's expert, Dr. Wilhelm, also included a case manager in her life care plan. Thus, the Court finds that an award that will provide for a case manager is warranted on this record. In this connection, Defendant's economic expert, Dr. Kenny, prepared a report in which he calculated the present value cost of a case manager roughly as recommended by the Plaintiff's life care plan (three hours per week at $60.00 per hour) to be $523,777.00. *Def.Ex. 24,* at 7. In consideration of all of the evidence, although we are unable to agree that an independent living facility is warranted, in view of the plain need for Nathan to be supervised for a lifetime, we find that an even greater provision for a case manager is reasonable and appropriate. In view of our finding that no award shall be made for an independent or group living facility, we conclude on this record that Plaintiff should have the assistance of a case manager four to five hours a week. Thus, we shall award $750,000.00 towards the cost of providing a case manager to provide the support, care, and "safety net" that Nathan will require.

Accordingly we find that the recommendations in Table 5, with the notable omission of an "independent living facility" are warranted.

Table 5—Support Care

| Support Care | Age | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| Family home | NOW–21 | | |
| respite care (child care specialist) * | NOW–21 | FRI. 4PM–SUN. 4PM 1 WKND/EV 2 MOS | 12.50/HR |
| housekeeper | NOW–21 | 4 HRS/DY 1 DY/WK | 51.00/DY |
| case manager | 22–LIFE | 4–5 HRS/WK | 60.00/HR |

* Not needed while amending residential school (model II)

---

7) *Ancillary Services*

46. The next category in the life care plan is entitled *"ancillary services." Pl.Ex. 4, Life Care Plan*, October 10, 1994, at 8. This includes a subcategory of "family counseling" "to address ... levels of expectation" and how to handle various situations with Nathan. *Trial Tr., Test. of Lawrence Forman*, November 15, 1996, at 84. Mr. Forman recommends "family counseling" for one year for one hour a week at a cost of $116 per hour. The second subcategory of "ancillary services" is "guardianship," which would come into play after Mr. and Mrs. Wareing's normal life expectancy, through Nathan's normal life expectancy, at a cost of $5,000.00 per year. This cost would go towards, among others, reimbursing the guardian for any expenses related to court filings and court reports. *Id.* at 85.

The "ancillary services" category of the life care plan also includes "airfare-roundtrip Miami–Wichita, Kansas," and for "airfare roundtrips Miami–Boston, MA" for Nathan and a parent in connection with travel expenses to a special summer program designed for children with Nathan's disabilities. *Id.* at 86. Mr. Foreman testified that Nathan's participation in these programs "would be invaluable," and the reason travel to these areas outside of Nathan's home is necessary is because these are specialty programs that "you don't see in every community." *Id.* at 86–87. The summer program in Kansas is called "Heartland" and the life care plan recommends that Nathan attend until age fourteen, while the summer program in Boston is recommended from age fifteen to eighteen. *Id.* at 87–88. The services recommended in the "ancillary services" section of the life care plan are reasonable and are detailed at Table 6.

Table 6—Ancillary Services

| Ancillary Services | Age | Frequency | Cost Per Visit/Item |
|---|---|---|---|
| Family counseling | now for 1 yr | 1 hr/wk | 116.00/HR |
| guardianship | at approx parent's normal life expectancy through child's normal life expectancy | yearly | 5,000.00/yr |

| | | | |
|---|---|---|---|
| airfare-roundtrip Miami–Wichita, Kansas | | | |
| for Nathan | age 7–14 | 1 X YR | 440.00/RT |
| for Parent | age 7–14 | 2 X YR | 440.00/RT |
| airfare-roundtrips Miami–Boston, MA * | | | |
| for Nathan | age 15–18 | 2 X YR | 1,070/RT |
| for Parent | age 15–18 | 2 X YR | 1,070/RT |

* If Nathan attends Eagle Hill

---

### 8) *Rehabilitation Equipment*

47. The next category listed on the life care plan is for *"rehabilitation equipment."* *Pl.Ex. 4, Life Care Plan,* October 10, 1994, at 9. The services and items recommended here, and undisputed on this record, are detailed at Table 7, *infra.* Mr. Forman testified that the items listed, such as a computer with educational software, are all "learning tools" which are self-paced. *Trial. Tr., Test. of Lawrence Forman,* November 15, 1996, at 88–89. In addition, according to Mr. Forman, the rehabilitation equipment listed will "do a lot of things" such as help Nathan "learn skills . . . help him budget his money." *Id.* Mr. Forman noted in particular that the portable computer would be useful for Nathan in aiding his memory. *Id.* at 90. Much of this equipment has already been purchased by the Wareings for Nathan's use. *Id.* at 91.

Table 7—Rehabilitation Equipment

| Rehabilitation Equipment | age over which services will be provided | frequency | cost per item/visit | vendor |
|---|---|---|---|---|
| IBM computer w/disc drive, monitor, word processor | LIFE | 1 EV 5 YRS | 4,500.00 | VANSTAR |
| educational software | NOW–21 | YEARLY | 400.00 | VANSTAR |
| cognitive software | NOW–21 | YEARLY | 1,000.00 | VANSTAR |
| software general | LIFE | YEARLY | 300.00 | VANSTAR |
| portable computer | AGE 12–21 | 1 EV 5 YRS | 987.00 | VANSTAR |
| perceptual sequencing program | NOW | 1 X | 100.00 | DLM catalog |
| perceptual motor program | NOW | 1 X | 116.50 | DLM catalog |
| Where is it? spacial relationship cards | NOW | 1 X | 5.95 | DRAGO |
| therapeutic records and tapes | LIFE | YEARLY | 65.00 | DLM catalog |

### 9) Medicines

48. The life care plan also induces a category for "*medicines*," and lists ritalin at 30 milligrams per day at a cost of $39.29 per 100 pills, as prescribed by a physician. *Pl.Ex. 4, Life Care Plan*, October 10, 1994, at 9. The record is undisputed on this matter.

### 10) Leisure and Recreation

49. The last category of the life care plan is entitled "*leisure/recreation.*" *Id.* at 10. The first two subcategories include the special summer programs already discussed, *supra*, in connection with the ancillary services of transportation to these programs. The next subcategory is "supervised trips/leisure time," which is recommended from age nineteen through life, for one to two weeks a year at a cost of *$150* per year, for a group tour where developmentally disabled or neurologically disabled persons can travel as a group on a "bus tour" and the like. *Trial Tr., Test. of Lawrence Forman*, November 15, 1996, at 93. The last subcategory is "*physical conditioning program*," which is recommended from age nineteen to forty-five at an annual cost of $695.00. Mr. Forman testified that this will "help him exercise and socialize" and "he will have a trainer to work with him two to three times a year." *Id.* at 93–94.

50. Defendant offered evidence of what it expects in terms of Nathan's future care and services, employment prospects and housing needs through the testimony of Cynthia Wilhelm, Ph.D. Dr. Wilhelm is an Associate Professor of Rehabilitation at the University of North Carolina School of Medicine. *Def. Ex. 20, C.V. of Cynthia L. Wilhelm*, at 2. Dr. Wilhelm was qualified as an expert in the field of rehabilitation and life care planning. Dr. Wilhelm testified that the first plan and the addendum she prepared differed notably in terms of the educational placements recommended based on new information she obtained concerning Nathan's case. In the addendum plan, Dr. Wilhelm presented two options for Nathan's educational placement, the first being the Easter Seals private school ("option I"), and the second being public school placement with additional therapy ("option II"). The balance of the life care plan provides for various medical evaluations (neurologist or neuropsychiatrist, psychological or neuropsychological, behavioral, and family assessment), a category of psychological treatment, provision for a case manager for a few hours a month, and for medications (ritalin). *Def.Ex. 38.* For the reasons already detailed at some length we have concluded that the Forman plan more appropriately provides for private schooling for Plaintiff.

While Dr. Wilhelm opined that Dr. Crown, Dr. Cullen and Mr. Forman were overly pessimistic in terms of their assessment of Nathan's potential and that their recommendations would lead to a "life of dependence" for Nathan, much of the recommendations in her life care plan are similar in kind and extent to the life care plan formulated by Mr. Forman. Indeed, Dr. Wilhelm testified that there is "agreement in global areas" between the plan she formulated and the plan submitted by Mr. Forman. Like the plan offered by Plaintiff, the life care plan formulated by Dr. Wilhelm provides for specialized education and therapy, various adaptive equipment such as a computer, medical evaluations and treatment, a case manager, and ritalin. Indeed, Dr. Wilhelm testified that in her opinion a private educational setting will be better for Nathan than a public school setting. The Defendant's plan differs from the Plaintiff's plan in that it is somewhat less comprehensive in its recommendations for certain evaluations and therapies, does not contain certain services and items recommended by Mr. Forman, such as a modest amount of respite care, housekeeping, guardianship expenses, special summer programs, supervised trips, and physical conditioning. However, again, although the plans differed in these respects, Dr. Wilhelm did acknowledge that both she and Mr. Forman were in agreement in many areas. The main difference between the plans, then, related to future living arrangements and the need for Nathan to be housed in an independent living facility and the need for vocational services.

51. Nathan will be best served by a "supported employment" scenario. Although

Plaintiff urged this Court to adopt a "sheltered workshop" for Nathan, we observe that Plaintiff's main rehabilitation expert, Mr. Forman, ultimately was of the opinion that "supported employment" should be the recommended option. To be sure, Mr. Forman expressed certain reservations concerning Nathan's ability to function effectively even in a "supported employment" environment, but ultimately adopted the recommendation for this option which was expressed by the others who reviewed Nathan's case in connection with the formulation of the life care plan. *See, e.g. Trial Tr., Test. of Robert Cullen, M.D.*, February 26, 1996, at 183 (stating that "[w]ithin reasonable medical probability, Nathan will be not employable in a competitive market"); *Trial Tr., Test. of Barry Crown, M.D.*, October 23, 1995, at 58–59 (stating that Nathan will not be able to get a job in the competitive workplace and "I believe that Nathan would require a supportive or benevolent environment" but "certainly not necessarily a sheltered workshop"). Although Dr. Wilhelm was of the opinion that Nathan had the capability to obtain a position in the competitive labor market, perhaps in a job like landscaping, she conceded that his neurological impairments would restrict his employment options to a position through a charitable organization such as Goodwill, which provides menial labor jobs with required supervision. The Court observes that the type of position Dr. Wilhelm envisioned is not all that different from what constitutes "supported employment." The better weight of the evidence suggested that Nathan will require a "supported employment environment," where Nathan will be placed with an outside employer with a job coach and real supervision. Nathan's deficits require, at a minimum, this level of supervision and care in view of his neurological impairments, his impaired motor abilities, lack of independent judgment and cognizance for his personal safety, as well as his attention deficits. The majority of the testimony suggested, however, that a sheltered workshop which is a more closely supervised, restrictive and expensive program, would not be best suited to Nathan's needs.

## (11) *Economic Calculations of Damages*

52. Plaintiff called Kenneth Clarkson, Ph. D., an economist, to testify as to his calculations of the present value of the expenses detailed in the life care plan as well as his calculations concerning Nathan Wareing's lost earning capacity. Dr. Clarkson is a Professor of Law and Economics at the University of Miami, and without objection from the Defendant, he was received as an expert in the field of economics. *Trial Tr., Test. of Dr. Clarkson*, November 17, 1995, at 9, 12.

Dr. Clarkson was retained to review the October 10, 1994 life care plan prepared by Larry Forman and project the future economic expense of that plan and reduce it to present value, as well as to render an opinion as to Nathan's wage loss. Dr. Clarkson's findings were reduced into a report which was received into evidence without objection from the Defendant. *Id.* at 13–15; *Pl.Ex. 5.*

Dr. Clarkson testified that he "went through [the Forman October 10, 1994 life care plan] page by page, categorized the line items and determined what the amount is at each respective age in today's dollars based upon the expenses and frequencies that he lists in his report." *Trial Tr., Test. of Dr. Clarkson*, November 17, 1995, at 28. The Court has credited Clarkson's testimony and expert report calculations. Dr. Clarkson averaged out the figures where a range was given, and notably excluded all items that were listed conditionally on an "if needed" or "as needed" basis. *Id.* at 29. The report is projected out to Nathan Wareing's life expectancy using standard statistical reference tables. *Id.* Using Dr. Clarkson's calculations of the present value of the services and items listed in the October 10, 1994 life care plan, assuming the "supportive employment model," and, notably, excepting the cost of the "independent living facility," but adding $750,000.00 for the provision of a case manager, we arrive at a total amount of *$1,401,-166.00* for future care. These are detailed in Table 8, *infra*, which is largely derived from Dr. Clarkson's report. In this connection, Dr. Clarkson made calculations in eight categories which are in some cases named slightly differently than the categories listed in the life care plan:

Table 8—Future Support Care and Education

| CATEGORY | PRESENT VALUE |
| --- | --- |
| medical expenses | $20,494.00 |
| therapy expenses | $300,681.00 |
| equipment | $69,626.00 |
| home care [case manager] | $750,000.00 |
| laboratory tests | $6,394.00 |
| personal care [ritalin] | $34,416.00 |
| ancillary services, education, and training [supported employment] | $171,144.00 |
| leisure/recreation | $48,411.00 |
| TOTAL FUTURE SUPPORT CARE AND EDUCATION | $1,401,166.00 |

53. Dr. Clarkson also testified at some length about Nathan Wareing's lost earning capacity. Dr. Clarkson made a number of calculations based on various assumptions about Nathan's pre-injury and post-injury potential. In connection with post-injury potential, the Court has concluded that the "supported employment" scenario presents the most probable outcome based on the evidence presented. Dr. Clarkson, however, performed his economic loss calculations based on a post-injury potential of "sheltered workshop," and reduced the amount of lost earning pre-injury by the "offset income" that would be earned under a sheltered workshop. *Trial Tr., Test. of Dr. Clarkson*, November 17, 1995, at 19–20.

The first two alternatives calculated by Dr. Clarkson assumed Nathan had a pre-injury potential of a college graduate, and differ as to whether there is a forty hour offset income or a twenty hour offset income. The third and fourth alternatives assumed Nathan had a pre-injury potential of a *junior college graduate*, and again differ as to whether a forty hour offset income or a twenty hour offset income is factored in the calculation. *See Pl.Ex. 5.*

In connection with Nathan's pre-injury potential, Plaintiff offered evidence to suggest that Nathan would have the ability to obtain a comparable level of educational attainment as his parents. In this regard, Bruce Wareing testified that he graduated college with a four-year degree. *Trial Tr., Test. of Bruce Wareing*, November 15, 1996, at 18. This degree was obtained in 1990 by taking many courses over the course of many years through the community college of the United States Air Force. *Id.; Trial Tr., Test. of Bruce Wareing*, November 22, 1995, at 106–107. Mr. Wareing is currently employed as a police officer with the City of Miami Beach. *Id.* at 16. Teresa Wareing completed high school and testified that she completed about two and a half years of college. *Trial Tr., Test. of Teresa Wareing*, February 27, 1996, at 125.

Dr. Crown testified that absent Nathan's exposure to "some type of impairment, some type of trauma, some type of deficit-inducing circumstance ... we would have expected Nathan to be able to perform at an average level." *Trial Tr., Test. of Barry Crown, M.D.*, October 23, 1995, at 28. Dr. Crown also opined that but for Nathan's neurologi-

cal deficits that "he would have the capacity and ability to go through high school and very likely would have been able to go through a skill base, skill training community college program, and possibly with the right support, through a four-year college program that might have been skill technology based." *Id.* at 61. Dr. Crown agreed that Nathan might have been able to become a police officer like his Dad. *Id.*

Defendant's expert, Dr. Bonnie Levin, testified that educational records and testing of a child's parents and siblings are important in determining pre-injury potential because most likely the child will fall into this range of achievement. Dr. Levin opined that in this case Nathan Wareing's pre-injury potential would likely mirror that of his parents and siblings, and likely fall into the low-average or average range. Dr. Wilhelm opined that Nathan's pre-injury potential was most likely that of two years post high school, or perhaps entry into the military like his father.

Lawrence W. Kenney, Ph.D., the Chairman of the economics department at the University of Florida, was called by the Defendant and was received by the Court as an expert witness in economics, lost earnings, and the cost of future care. Dr. Kenney also prepared a report on the economic losses for Nathan Wareing, which was received into evidence. *See Def. Ex. 24.* Dr. Kenney's report provided a number of calculations based on a variety of pre-injury assumptions of whether Nathan would be a high school graduate, obtain two years of college, or achieve a four year college degree, correlated with an offset from various post-injury assumptions, including a minimum wage job, a high school graduate, or a factory or warehouse job. Based on these calculations, Dr. Kenney's report indicated that the lost earnings given a pre-injury potential of two years of college and a post injury potential of a minimum wage job would net out to be $698,-461.00. *Id.* at 5. Based on a thorough review of the evidence we find that Nathan had a pre-injury potential of a two-year college education and obtaining employment reasonably comparable to his father Bruce Wareing, who is a police officer, and that Nathan

has a post-injury potential of various low-skilled positions in a supported employment environment. Based on the foregoing testimony concerning pre-injury and post-injury potential, and based on the findings of this Court, Dr. Kenney calculated the Plaintiff's lost earning to be $698,461.00. *Id.* The Court finds this amount to reasonably approximate Nathan's lost earnings.

## II. *CONCLUSIONS OF LAW*

54. Plaintiff brings this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* ("FTCA"). The FTCA provides the United States shall be liable as a private person "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Accordingly, the state substantive law shall govern an action brought under the Act. 28 U.S.C. §§ 1346(b), 2674.

55. In this case, the allegations of medical malpractice took place in the U.S. Territory of Guam and therefore the law of Guam is controlling. *Id.* Under the Guam Civil Code, "[e]very one is responsible not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has willfully brought the injury upon himself." 18 GUAM CIV.CODE § 90107 (1992). Moreover, the Guam Code provides that "[f]or the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby. . . ." 20 GUAM CIV.CODE § 2225 (1992).

The law of Guam is informed generally by California law. *Guam v. Yang,* 800 F.2d 945, 947 (9th Cir.1986) (stating that "[a]bsent controlling Guam authority . . . it [is] appropriate to look to California law for guidance") (*quoting Smith v. Lujan,* 588 F.2d 1304, 1306 (9th Cir.1979)), *on reh'g,* 850 F.2d 507 (9th Cir.1988); *see also Guam v. Ojeda,* 758 F.2d 403, 406 (9th Cir.1985) (stating that when Guam law is unclear, California cases are persuasive). The Guam Civil Code was part of the Territorial Laws adopted in 1933. *Roberto v. Aguon,* 519 F.2d 754, 755 (9th Cir. 1975). It has been noted that "decisions of

California courts which predate the enactment of the Territorial Laws are controlling authority on issues of the statutory construction and effect of Guam laws, and that California cases subsequent to the adoption of the Guam codes while not binding, are persuasive." *Id.; see also In re Guam Asbestos Litigation,* 1993 WL 470426, *8 & n. 2 (D.Guam App.Div. Oct. 19, 1993), *aff'd,* 61 F.3d 910 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2496, 135 L.Ed.2d 188 (1996).

56. California courts have stated the classic elements of a negligence action in the following way:

(a) a defendant's legal duty to exercise due care;

(b) defendant's breach of that duty;

(c) the breach is the actual ("but for") cause of plaintiff's injury;

(d) the breach is the proximate or legal cause of plaintiff's injury; and

(e) damages to plaintiff.

*Beauchene v. Synanon Foundation, Inc.,* 88 Cal.App.3d 342, 151 Cal.Rptr. 796, 797 (1979).

In order to prevail, the Plaintiff must demonstrate each of these elements by a preponderance of the evidence.

### A. Duty

57. The United States, as sovereign, " 'is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' " *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (quoting *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941)). The Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.,* is an express waiver of that immunity. Congress has provided that federal district courts have exclusive jurisdiction "of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346. Moreover, the FTCA provides that the "United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674.

58. As noted, *supra,* Guam law clearly provides that Defendant is "responsible ... for an injury occasioned to another by his want of ordinary care or skill" 18 GUAM CIV.CODE § 90107 (1992). Moreover, the Supreme Court of California has discussed the standard of care of a physician in these terms:

"[T]he legal standard of care required by doctors is the standard of practice required by their own profession." *(Weiler, Medical Malpractice on Trial* (1991) p. 19 [hereinafter Weiler].) "The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances." *(Bardessono v. Michels,* (1970) 3 Cal.3d 780, 788, 91 Cal. Rptr. 760, 478 P.2d 480.) Thus, liability is not found, and the label malpractice is not placed upon a physician's actions, unless "some deviation by the [physician] from the standard of care that his peers consider appropriate in the situation under review" is proven. (Weiler, *supra,* at p. 25.) Whether the negligent act is the result of a momentary lapse of concentration or gross disregard for the health of the patient, in order to prevail on a claim for medical malpractice, a plaintiff must convince the trier of fact that the physician's peers would consider his act to be blameworthy....

*Burgess v. Superior Court,* 2 Cal.4th 1064, 9 Cal.Rptr.2d 615, 624, 831 P.2d 1197, 1206 (1992); *see also Munro v. Regents of the University of California,* 215 Cal.App.3d 977, 263 Cal.Rptr. 878, 882 (1989) (noting that "[t]he standard of care in a medical malpractice case requires that physicians exercise in diagnosis and treatment that reasonable degree of skill, knowledge and care ordinarily

possessed and exercised by members of the medical profession under similar circumstances"). As applied to the case *sub judice,* the Defendant plainly had a legal duty to provide reasonable and competent medical care in conformity with the applicable standard of care to Teresa Wareing during the course of her pregnancy with her son Nathan Wareing.

### B. *Breach*

59. As an initial matter, we note that the Defendant has entered into a stipulation of fact concerning the breach of standard of care. Defendant stipulated as follows:

> Defendant, United States of America, by and through its legal counsel, stipulates that there was a deviation from the medical standard of care in the above-captioned case. Specifically, defendant stipulates that its agents or employees at the Naval Hospital in Guam should have performed the cesarian section prior to 5:37 a.m. on May 3rd, 1985, and that the failure to do so constituted a deviation from the medical standard of care.

*Def's Stipulation on the Issue of Standard of Care,* May 1, 1995 [D.E. 94]. In addition to the Defendant's stipulation, Plaintiff offered overwhelming evidence that Defendant breached its duty to provide medical care within the applicable standard of care. The main breach committed by Defendant was the failure to perform an emergency cesarian section at about 1:15 a.m. in the morning of May 3, 1985, and the concomitant delay in applying needed medical care to prevent a serious neurological insult. Part and parcel of this breach were a number of associated breaches which were contributory to the main breach. For one, as noted, we have credited Dr. Oakes' testimony to the effect that the failure to appreciate the high risk nature of a pregnancy and the failure to properly and closely monitor thereafter was a breach of the standard of care. In addition, it was a breach in the standard of care to fail to communicate that patient's medical condition, as a high-risk, post-date patient, with a decreased amount of amniotic fluid. Dr. Oakes further opined and we have found that the failure of the medical

providers to appreciate the significance and properly communicate the finding of thick meconium at about 1:00 a.m. on the morning of May 3, 1985 was likewise a breach of the standard of care. Indeed it was a plain breach of the standard of care to fail to monitor and appreciate not only a finding of thick meconium, but also minimal beat-to-beat variability after the rupture of the membranes in a woman who is post-date and who had a finding of minimal amniotic fluid. The twin findings of thick meconium and decreased variability at around 1:00 a.m. on the morning of May 3, 1985, plainly indicated fetal distress and the necessity for delivery immediately, and the failure to take appropriate imminent action constituted a departure from the prescribed standard of care. The Court is persuaded by Dr. Oakes' opinion that the standard of care required the calling of a cesarian section sometime between 1:15 a.m. and 1:45 a.m. on the morning of May 3, 1985, and that the procedure should have been done within thirty minutes after it was called. Dr. Oakes described another associated breach of the standard of care in connection with the arrest of cervical dilation from approximately 1:00 a.m. until the time of delivery at 5:40 a.m. Again, the failure to take action in view of an arrest of cervical dilation for more than two hours constituted a breach of the standard of care. Still another related breach of the standard of care inhered in the failure to properly monitor the progress of labor, and, in particular, the failure to chart several notable decelerations of the heart rate on the fetal heart monitor strips. Moreover, the record established a breach of the standard of care in respect to the *delay* in performing the cesarian section until 5:40 a.m., once it was belatedly called. The procedure was not completed for at least an hour, and perhaps as much as an hour-and-a-half past the time it was "called." In sum, the Plaintiff has satisfied his burden of proving that Defendant committed a breach of its duty of care in connection with the labor and delivery of Nathan Wareing.

### C. *Causation*

60. The next element in a claim for negligence is that the defendant's breach was

the cause of plaintiff's injury. This matter was hotly contested at the trial. Based upon a thorough review of all the evidence presented, we have found that Plaintiff has proven by a preponderance of the evidence that the aforementioned breaches were the legal cause of Nathan Wareing's injuries.

It has been noted that "[a] legal cause of injury, damage, loss or harm is a cause which is a substantial factor in bringing about the injury, damage, loss or harm." *In re Guam Asbestos Litigation,* 1993 WL 470426 at *7; *see also Espinosa v. Little Co. of Mary Hosp.,* 31 Cal.App.4th 1304, 37 Cal.Rptr.2d 541, 547 (1995). Moreover, "[i]n a medical malpractice action, the evidence must be sufficient to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." *Alef v. Alta Bates Hosp.,* 5 Cal.App.4th 208, 6 Cal.Rptr.2d 900, 905 (1992). One California appellate court described the causation analysis in these terms:

> Liability for medical malpractice is predicated upon a proximate causal connection between the negligent conduct and the resulting injury. (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200, 98 Cal.Rptr. 849, 491 P.2d 433.) "Causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action...."

*Dumas v. Cooney,* 235 Cal.App.3d 1593, 1 Cal.Rptr.2d 584, 589 (1991).

Plaintiff's experts on causation, principally Dr. Enzmann and Dr. Coen, provided a persuasive account of the type, timing, and, ultimately, the cause of the injury suffered by Nathan Wareing. The Court has specifically credited Dr. Enzmann's opinion that Nathan Wareing suffered from a hypoxic ischemic insult and that this injury was sustained during the perinatal period or at term. We are also persuaded by Dr. Enzmann's opinion that his review of the MRI and CT scans failed to reveal any evidence of a developmental or metabolic disorder, and that additionally there was no evidence of an injury caused by an infection in this case. We accept Dr. Enzmann's expert opinion that Nathan sustained significant hypoxic ischemic insults some four to five hours prior to birth causing injury to the baby's brain. Dr. Enzmann's conclusions were further supported by the opinion of Dr. Coen, who noted that Nathan Wareing was stable and in good condition prior to labor, and offered his opinion that the hypoxic injury suffered by Plaintiff commenced at about 1:00 a.m. in the morning of May 3, 1985, when there was a finding of meconium in the amniotic fluid. In addition, Dr. Coen agreed with Dr. Enzmann that neither an infection nor a genetic process played any role in Nathan Wareing's injury. Dr. Coen was also persuaded by the medical evidence of early post-partum seizures and multi-organ failures, which likewise indicated a moderate to severe hypoxic ischemic injury and suggested a poor neurological long-term outcome.

The Court also credited Dr. Cullen's opinion as to the cause of Nathan Wareing's injury, which was consonant with the opinions expressed by Dr. Enzmann and Dr. Coen. Dr. Cullen observed that the cause of the injury was related to an hypoxic insult which occurred in hours during labor, and more particularly between approximately 1:00 a.m. and the the time of delivery, in a progressive fashion. Dr. Cullen further opined that the hypoxic ischemic insult has left the Plaintiff with serious and permanent neurological deficits, which has affected his cognitive and intellectual abilities, his physiological development, his psychological development and his motor functions. Dr. Cullen sharpened his opinion in this regard and testified that, within reasonable medical probability, had Nathan Wareing been delivered earlier, or at around 1:30 a.m. in the morning on May 3, 1985, he would not have

incurred a permanent neurological injury, and would have had a normal I.Q. Moreover, Dr. Cullen agreed with the Plaintiff's other experts that Nathan's injury was not the result of a structural or congenital defect in the brain, nor was it genetic in origin nor, finally, was it caused by an infection.

In sum, the evidence convincingly established that the failure to appreciate the risks, the concomitant failures to promptly communicate significant medical findings, or to properly monitor and document the patient's medical condition, and, most notably, the failure to timely perform a cesarian section at around 1:15 a.m. on the morning of May 3, 1985 caused Nathan's injuries and resulting neurological deficits.

### D. Damages

61. Finally, Plaintiff must establish resulting damages. Guam law provides that "[f]or the breach of an obligation not arising from contract, the measure of damages ... is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." 20 GUAM CIV.CODE § 225. As a general matter, there must be evidence in the record to support an award of damages for future losses. *Lampley v. Government of Guam*, 882 F.Supp. 957, 959 (D.Guam App. Div.1995). A damage award must be based on a reasonable amount that would compensate the plaintiff for any actual losses, actual pain and suffering, as well as any future losses which are supported by substantial evidence. *Id.* at 958–59. The question of whether damages are incurred, turns "almost entirely on the strength of the testimony and the evidence introduced at trial," *Aguon v. Taijeron*, 1983 WL 30217, *3 (D.Guam App. Div. Dec. 13, 1983), *aff'd*, 758 F.2d 655 (9th Cir.1985). Moreover, "[t]he determination of damages is primarily a factual matter...." *Niles v. City of San Rafael*, 42 Cal.App.3d 230, 116 Cal.Rptr. 733, 739 (1974).

Damages for negligence typically include a right to recover "all of the economic, pecuniary damages—such as medical expenses or lost earnings—resulting from the injury...." *Fein v. Permanente Medical Group*, 38 Cal.3d 137, 211 Cal.Rptr. 368, 383–84, 695 P.2d 665, 680 (1985) (en banc). More specifically, courts have approved awards of future care including: nursing care; physician services; medical laboratory services; educational and therapeutic services, including physical occupational, and speech therapy; special medical appliances such as wheelchairs or specially equipped vehicles; and, medicines. *Fortman v. Hemco, Inc.*, 211 Cal.App.3d 241, 259 Cal.Rptr. 311, 320 (1989). None of these categories of rehabilitative services and future support care expenses have been thought to be "novel." *Id.* 259 Cal.Rptr. at 322; *see also Muenstermann v. United States*, 787 F.Supp. 499, 516 (D.Md. 1992) (finding plaintiff's present and future needs include "(1) special educational services; (2) attendant care at home as a child and at an adult living center when mature; (3) physical psychotherapy, occupational and speech therapy; (4) certain equipment and supplies; (5) medical services including future surgery; (6) transportation; and (7) annual evaluations").

The record evidence in this case amply proved the damages suffered by Nathan Wareing as a result of Defendant's deviations from the standard of care. The battery of tests administered to Nathan revealed a below average I.Q. and, according to Dr. Crown, placed him in the "educable retarded" range. The Court credits Dr. Crown's opinion that Nathan's injuries have caused his cognitive abilities to plateau at about the *third to fourth grade level*—meaning that the brain injury suffered by Nathan has caused permanent neurological deficits that will always impair his ability to function normally. We likewise credit Dr. Cullen's testimony that Nathan Wareing will permanently function at the level of a ten to twelve year old. We acknowledge and credit Dr. Borenstein's testimony as to the delays and problems that Nathan has encountered in an academic setting.

Furthermore, Plaintiff offered significant evidence to support the conclusion that Nathan's functional abilities were greatly impaired by his brain injury. More specifically, the preponderance of the evidence demonstrated that Nathan has, among other things,

substantial speech and language problems, significant difficulties with personal hygiene, an inability to tell time, know his address or telephone number, or perceive the value of and effectively utilize money. All of this leads the Court to conclude that Nathan will require substantial supervision and support for the balance of his life. In addition, the Court notes with specific concern the evidence of Nathan's inability to take appropriate care in connection with matters involving personal safety. In this connection, the Court credits the testimony of Teresa and Bruce Wareing, as well as the records and testimony of Larry Forman. These witnesses, especially Mr. and Mrs. Wareing, were particularly well-situated to observe and accurately report on Nathan's abilities and deficits in functioning on a practical day-to-day level. There was also support in the record, in particular from the testimony of Dr. Crown, Larry Forman, and Nathan's teachers and therapists, that Nathan's social development and social skills have been very considerably impaired.

The Court also credits Dr. Crown's testimony concerning Nathan's awareness of his own limitations as well as the profound difficulties he will face in terms of knowing his social place, his social role, and the problems he will encounter as his physical body matures while his cognitive abilities largely remain stagnant.

62. An award of past educational expenses is both reasonable and warranted. Moreover, by and large, the future support and care services detailed in the October 10, 1994 life care plan prepared by Larry Forman, and discussed more fully *supra*, represents a reasonable and appropriate measure of the expenses that Nathan will incur due to his injury. The great majority of the services recommended by Plaintiff's life care plan were not contested by Defendant. Indeed, in substantial measure Defendant did not offer any testimony to suggest that a majority of the items or services provided in the life care plan drafted by Mr. Forman were excessive, unnecessary, or unrelated to Nathan Wareing's injury. There was, however, a substantial dispute concerning the most appropriate educational placement, and

the future employment scenario Nathan could likely expect, as well as a powerful dispute concerning his future housing needs. With respect to the most appropriate educational placement for Nathan, the Court was persuaded by, among other things, the testimony of Larry Forman, who opined that a private school education will be most beneficial in enabling Nathan to achieve his fullest potential.

Turning next to the issue of future employment placement, we conclude that the most credible evidence pointed towards a "supported employment" scenario for Nathan, which would require a special supervisory working environment with periodic vocational training. Although some of the testimony presented may have suggested that Nathan would only be able to function in a "sheltered workshop," and, at the other end of the spectrum, that Nathan possessed the ability to obtain gainful employment in a competitive marketplace, we are convinced that Nathan would be best served in a "supported employment" environment.

Finally, the subject of Nathan's future "support care" including his future housing requirements was disputed between the parties. In connection with future home care, we rejected Plaintiff's argument that an independent living facility at a cost of about $300 per day is warranted. Plaintiff has not demonstrated by a preponderance of the evidence that such a living arrangement, at this enormous cost, will be required or that it will be most appropriate for Nathan. There were several deficiencies in the proof including most notably that Plaintiff's principal witness on the need for an independent living facility, offered testimony that was unclear, ambiguous, and not altogether convincing. Furthermore, on this record it is not at all clear that Nathan will likely move out of the family home at age twenty-two and require a facility like an independent living facility. We are exceedingly reluctant to make so large an award on so limited an evidentiary record.

Although Defendant essentially took the position that Nathan would be able to live independently, Defendant's experts did not disagree that Nathan would benefit from the assistance of living with a roommate, and

that he would benefit by having the supervisory skills of a case manager at hand. All of the experts were in basic agreement that Nathan's functional problems would necessitate a real measure of support, training, therapy, and, ultimately supervision over his daily life. While Plaintiff has failed to meet his burden that an independent living facility is warranted on this record, the evidence strongly demonstrated that Nathan will require significant supervision over his living arrangements should he move outside the family home as contemplated by Mr. Forman. Accordingly, we concur with the recommendation of both life care and rehabilitation experts that a case manager would be warranted for Nathan's future care. An award that will provide for a case manager is warranted here. Defendant's expert, Dr. Kenny, prepared a report in which he calculated the present value cost of a case manager roughly as recommended by the Plaintiff's life care plan (three hours per week at $60.00 per hour) to be $523,777.00. *Def.Ex. 24*, at 7. We believe this amount, plus an additional sum for an increased level of case management, as discussed, *supra*, is required. Thus, we award $750,000.00 towards the cost of providing a case manager to provide the support, care, and "safety net" that Nathan will require.

63. The Court credited Dr. Clarkson's testimony and expert report in respect to the present value calculations of the measure of damages compiled for future support care. According to Dr. Clarkson's calculations, the present value of the services and items listed in the October 10, 1994 life care plan based on the assumptions and findings discussed, *supra*, concerning private education, supported employment, less the independent living facility, but adding the increased level of case management, is *$1,401,166.00*.

The Court has additionally concluded in connection with lost earning capacity that Nathan had a pre-injury potential of a two-year college education and the potential to obtain employment comparable to that of his father Bruce Wareing, who is a police officer, and that Nathan has a post-injury potential of various low-skilled positions in a supported employment environment. Based on the foregoing testimony concerning pre-injury and post-injury potential, Dr. Kenney, Defendant's expert, calculated the lost earnings to be and we award $698,461.00.

64. Defendant also argued that the Court should take into account the free educational services provided by the Broward County public school system, or the vocational and therapeutic services provided by the Florida Division of Vocational Rehabilitation or Goodwill Industries in fashioning an appropriate damage award, and that the damages should be limited or offset by the availability of these services. More particularly, the Defendant submitted that the Court should consider the availability of these services because the "collateral source rule" does not apply inasmuch as these services are not independent from the Defendant—that is, they are not "collateral sources." Plaintiff answered that the collateral source rule, under applicable Guamanian law, operates to bar evidence of free education and therapy sources, and further that Plaintiff's damages cannot be reduced anyway by the "availability" of these services. We agree with Plaintiff that the award of damages ought not to be reduced as Defendant suggests.

To begin, the "collateral source rule" provides that a defendant tortfeasor may not mitigate his damages by evidence of compensation actually or constructively received by the plaintiff victim from a source independent and collateral to the defendant tortfeasor. *Helfend v. Southern California Rapid Transit Dist.*, 2 Cal.3d 1, 84 Cal.Rptr. 173, 181, 465 P.2d 61, 69 (1970) (en banc); *see also Rest.2d Torts, § 920A* (providing that "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable"). The comments to the Restatement further explicate the nature and operation of the "collateral source rule":

Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant. The injured party's net loss

may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor.... The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss the injured party receives.

*Rest.2d Torts, § 920A cmt. b.*

■ Both parties essentially agree that the common law "collateral source rule" remains the governing law in Guam. There is no specific provision of the Guam Code detailing the operation of the "collateral source rule" and thus Guam law is informed by relevant California authority. *Guam v. Yang,* 800 F.2d at 947; *Guam v. Ojeda,* 758 F.2d at 406. The "collateral source rule" has been traditionally applied by California courts, notwithstanding later statutory enactments in California which have modified the rule as it applies to medical malpractice cases. *Helfend,* 84 Cal.Rptr. at 181, 465 P.2d at 69 (stating that "[w]e therefore reaffirm our adherence to the collateral source rule in tort cases"); CAL.CIVIL CODE § 3333.1 (West. 1996).

In contrast, Guam has not legislatively modified the common law collateral source rule in any manner. Indeed, in one code section involving worker's compensation, the Guam Code provides that "[t]he amount of compensation paid by the employer, or in the amount of compensation to which the injured employee or his dependents are entitled, shall not be used in order to diminish the employer's claim or the employee's claim against said third persons. *The collateral source doctrine is reemphasized and reestablished by this Code Section.*" 22 GUAM CIV. CODE § 9134 (1995) (emphasis added).

At all events, the applicability of the "collateral source rule" to this case is not what

Defendant urges. Defendant submits that free public education and vocational services do not fall within the confines of the "collateral source rule" because they are not "independent" from the Defendant or "collateral" to it. Defendant submits that the Broward County public schools, the Florida Division of Vocational Rehabilitation, and Goodwill industries all receive significant amounts of federal funding, and enjoy a close relationship with the federal government. In this way, Defendant takes the position that the availability of these services should be credited against the total damage award in this case.

Defendant's argument need not detain us for even if the services were not deemed to be "collateral sources" because of the Defendant's partial funding and close involvement with the provision of the services, we conclude that the availability of these services do not mitigate the damage award in this case because the services the Defendant offers are not *coextensive, equal to, or even comparable* to what is otherwise accessible elsewhere. In short, it can not be said that the availability of these services either actually or even constructively would confer a benefit or reduce Plaintiff's net loss. Put another way, because based on the evidence we have found that a private school education is the most beneficial and appropriate educational placement for Nathan, the mere availability of a public school education, even with special education and programs for persons with disabilities is not relevant in terms of reducing the damages. In this respect the evidence suggested and we have found as a fact that in this case private school placement was far superior to and more appropriate for Nathan than public school placement. Because of this, the net loss can not be reduced by the availability of a public school education different in kind.

The comments to the Restatement emphasize that "[i]f a tort defendant makes a payment toward his tort liability, it of course has the effect of reducing that liability." *Rest.2d Torts, § 920A cmt. a.* Here, however, the availability of a different type of educational placement, an inferior placement for Nathan, cannot, we think, have "the effect of reducing

that liability." Stated in a different fashion, the traditional concern over paying "twice for the same injury," *Brooks v. United States,* 337 U.S. 49, 53–54, 69 S.Ct. 918, 921, 93 L.Ed. 1200 (1949), only comes into play where the element of tort damages are the "equivalent" of the particular benefit conferred. The evidence showed that the availability of a free public education, as well as the therapeutic and vocational services provided by the Florida Division of Vocational Rehabilitation and Goodwill Industries, are not the "equivalent" of the services which the Plaintiff demonstrated that Nathan required. Although we received the evidence of the services offered by the Defendant and believe that they are admissible, notwithstanding the "collateral source rule" because the services arguably are not "collateral" or "independent" from the Defendant, we decline to mitigate or reduce the damage award because of them. Under this set of facts and circumstances, then, the full amount of the reasonable and warranted educational, therapeutic and vocational services shall be awarded without mitigation.

65. The final element of damages sought by Plaintiff are noneconomic. "Noneconomic damages" have been defined as "subjective, non-monetary losses including, but not limited to pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." Cal.Civ.Code § 1431.2(b)(2) (West 1996). Guamanian courts permit an award for pain and suffering supported by an appropriate evidentiary foundation. *Lampley,* 882 F.Supp. at 959. Another court from Guam observed that "[t]he award for pain and suffering is by its nature a subjective determination." *Porter v. Tupaz,* 1984 WL 48854, *5 (D.Guam App.Div. June 12, 1984), *aff'd,* 760 F.2d 276 (9th Cir.1985). An award of pain and suffering damages will be upheld if, upon review of all of the testimony and upon evaluation of the credibility of the witnesses, the trier of fact awards a reasonable amount of damages under the circumstances.

*Id.* at *6. Absent "a specific showing of prejudice or unreasonableness," or an amount of damages which "shock one's sense of justice," or the appearance that the damages "have been arrived at through passion or prejudice," or a finding that the damages "are [ ] so plainly out of measure," the award for noneconomic damages will be sustained. *Id.*

The California Supreme Court has discussed the issue of pain and suffering in the following terms:

... "If a cause of action is otherwise established, it is settled that damages may be given for mental suffering naturally ensuing from the acts complained of." (*State Rubbish etc. Ass'n v. Siliznoff,* (1952), 38 Cal.2d 330, 338, 240 P.2d 282, 286.) In general, courts have not attempted to draw distinctions between the elements of "pain" on the one hand, and "suffering" on the other, rather, the unitary concept of "pain and suffering" has served as a convenient label under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal. (*Crisci v. Security Ins. Co.,* (1967) 66 Cal.2d 425, 433, 58 Cal.Rptr. 13, 426 P.2d 173; *Werchick, Unmeasurable Damages and a Yardstick* (1966) 17 Hastings L.J. 263.) Admittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty. (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 511–512, 15 Cal.Rptr. 161, 364 P.2d 337 (dissenting opinion of Traynor, J.); *McCormick on Damages,* (1935) pp. 318–319.) But the detriment, nevertheless, is a genuine one that requires compensation. (Civ.Code § 333; *State Rubbish etc. Ass'n v. Siliznoff, Supra,* 38 Cal.2d 330, 240 P.2d 282), and the issue generally must be resolved by the "impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence." (*Beagle v. Vasold* (1966) 65 Cal.2d 166, 181, 53 Cal.Rptr. 129, 137, 417 P.2d 673, 681); *cf. Seffert v. Los Angeles Transit Lines, Supra,* 56

Cal.2d 498, 507, 15 Cal.Rptr. 161, 364 P.2d 337.

Indeed, mental suffering frequently constitutes the principal element of tort damages. (Rest.2d Torts § 905 Com.C.); awards which fail to compensate for pain and suffering have been held inadequate as a matter of law. (*Clifford v. Ruocco*, (1952) 39 Cal.2d 327, 329, 246 P.2d 651; *Haskins v. Holmes*, (1967) 252 Cal.App.2d 580, 586–587, 60 Cal.Rptr. 659; *Buniger v. Buniger*, (1967) 249 Cal.App.2d 50, 54, 57 Cal.Rptr. 1; *Gallentine v. Richardson* (1967) 248 Cal.App.2d 152, 155, 56 Cal. Rptr. 237; *Chinnis v. Pomona Pump Co.*, (1940) 36 Cal.App.2d 633, 642–43, 98 P.2d 560; *Bencich v. Market St. Ry. Co.* (1937) 20 Cal.App.2d 518, 522, 67 P.2d 398.).

*Capelouto v. Kaiser Foundation Hospitals,* 7 Cal.3d 889, 103 Cal.Rptr. 856, 859, 500 P.2d 880, 883 (1972) (en banc).

Because of the necessarily subjective nature of noneconomic damages, courts have often found guidance by reference to analogous cases involving similar injuries. *See, e.g., Lozada v. United States,* 140 F.R.D. 404, 414–15 (D.Neb.1991) (stating that "[i]n determining what amount will reasonably compensate plaintiff for his injury, pain and suffering and inconvenience, the Court has considered the awards granted in similar cases"), *aff'd,* 974 F.2d 986 (8th Cir.1992). One Guamanian court has taken the view that "while analogies to, and comparisons with, other cases may be helpful on many types of issues, their usefulness on questions of damages is extremely limited." *Porter,* 1984 WL 48854 at *5. Mindful of the *Porter* court's skepticism in reviewing analogous cases, we proceed to consider some illustrative cases not for purpose of obtaining a definitive standard of measure of noneconomic damages in a brain injury case, but rather as an informative guide to the range of awards that other courts have determined to be just and appropriate.

One case from California illustrates an extremely high award of noneconomic damages. In that one, the Second District Court of Appeal affirmed the trial court's award of noneconomic damages that were assessed at *$6 million* in a case involving a child's seri-ous and permanent neurological and physical injuries incurred when the child was ejected from her parent's jeep due to a defective door handle while the vehicle was in operation. *Fortman v. Hemco, Inc.,* 211 Cal. App.3d 241, 259 Cal.Rptr. 311, 313, 321–22 (1989). The child in *Fortman,* suffered extremely serious injuries, including, among other things, spinal cord injuries which left her a paraplegic and brain injuries which will relegate her to functioning at a five-year-old's level and may have caused cortical blindness. *Id.* 259 Cal.Rptr. at 320.

An example of an award of noneconomic damages in a brain injury case which falls on the opposite end of the spectrum is found in *Lozada,* cited *supra.* In *Lozada,* a district court was faced with a FTCA suit brought on behalf of a child alleging negligence in the delivery and medical care rendered. In that case, the court found that "Plaintiff is a brain damaged, profoundly retarded and motor handicapped boy with a future of total custodial care." Upon a review of the award of noneconomic damages in other cases, the Court awarded *$500,000.00* in noneconomic damages. *Lozada,* 140 F.R.D. at 414–15 & n. 3.

Several other illustrative cases involving child brain injuries include awards for noneconomic damages which fall into an intermediate range between the *Fortman* and *Lozada* cases. In *Muenstermann v. United States,* 787 F.Supp. 499 (D.Md.1992), for example, a district court awarded *$800,000* in nonpecuniary damages in a case involving alleged negligence in the delivery of the child. The Court found that the child suffered from permanent brain damage which included apparent physical manifestations in terms of motor impairments. The brain injury caused the child to have profound delays in functional abilities which left him unable to dress himself, or go to the bathroom by himself. Moreover, the brain injury caused severe impairments to the child's communicative abilities and the medical evidence suggested that his development would plateau at the eight or nine-year old level. *Id.* at 515–16. In commenting on the award, the district court observed:

The full extent of nonpecuniary damages is difficult to measure. The amorphous nature of the subject and the infinite variables that come into play make it impossible for court to fashion any precise rule. However, the strictures of reasonableness, and the nature of the injuries, length of the suffering are guides which assist in determining a fair award.

. . . .

. . . [T]his Court awards Jonathan $800,000 for the nonpecuniary loss he has and will continue to suffer. Jonathan's brain is permanently and severely damaged. This damage robs him of the ability to ever know the joys of even doing the most usual and familiar tasks. He has severe difficulties in attempting even the simplest communication with others. This deficiency will leave him somewhat more lonely and isolated from the world around him.

Jonathan will never live independently. He requires help to dress and go to the bathroom. He lags far behind his peers and he knows it. As he grows the effects of his disabilities will be magnified when compared against the tasks others take for granted and that he will never be able to do.

*Id.* at 527–28.

In another case, a district court was faced with an FTCA action involving allegations of medical malpractice in the labor and delivery of a child. *1st of America Bank, Mid–Michigan, N.A. v. United States,* 752 F.Supp. 764 (E.D.Mich.1990). The child in that case suffered from cerebral palsy, cortical blindness and retardation. Moreover, the child suffered from motor problems and possessed the language skills of an infant at five years old. The district court noted that the child could not walk or talk meaningfully, was unable to go to the bathroom independently, feed herself, or see. *Id.* at 768. The district court detailed its reasoning concerning the amount of noneconomic damages:

Finally, the Court must determine the amount of noneconomic damages. Noneconomic damages in this case are based on Michaela's disability, disfigurement and pain and suffering. The video demonstrating her great physical limitations underscore the extent of her disability. There was a great deal of testimony regarding her limited capacities for meaningful movement, for communication, and for normal human progress. She will spend her life in special schools, in various kinds of therapy, and will require special equipment for normal tasks such as eating and communicating. There is no question that she has a compensable disability. Her disfigurement is minimal, but she does suffer some. Her eyes do not focus and she requires special shoes. She is in a state of constant motion. Finally, it is difficult to assess her pain and suffering. She will not live a life like her sister and brother. But Dr. Menkes testified that it is difficult to estimate her intelligence. It is unclear whether she will be aware of the differences. Fortunately, Dr. Vallarta testified that Michaela is a happy child. Her mother described smiles, and the Court observed the smiles and the good care she receives in the video presented as Ex. 90.

The Plaintiff seeks $2,000,000.00 in noneconomic damages, past and future. The Court finds that this is a reasonable figure established by a preponderance of the evidence for Michaela's noneconomic injury, particularly her disability.

*Id.* at 780.

One final example of a noneconomic damage award comes from a district court opinion in still another FTCA case involving alleged brain injury suffered in connection with the care of a four and one half month old infant who had infantile spinal meningitis. *Hill v. United States,* 854 F.Supp. 727 (D.Colo.1994), *aff'd in part and rev'd in part on other grounds,* 81 F.3d 118 (10th Cir. 1996), *cert. denied,* — U.S. —, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996). In *Hill,* the child's injuries left her with severe mental and motor skill impairments, and in particular the child was unable to be toilet trained and had to be fed through a tube. *Id.* at 729. The district court found that the child "has suffered enormous pain and suffering and a manifest loss of enjoyment of life" and thereupon awarded *$500,000,* the maximum allowable for noneconomic losses under Colorado law. *Id.* at 732. In addition, the district

court awarded compensation under Colorado law for past and future disfigurement in the amount of *$2,500,000.00. Id.*

Plaintiff submits that the serious, permanent, neurological injury sustained by Nathan Wareing justifies a substantial award of non-economic damages. Plaintiff stressed the permanency of the injury, the constant need for supervision and care over his lifetime, and the indications that Nathan is aware and frustrated by his limitations. Based on this, Plaintiff sought $4,000,000.00. Defendant, on the other hand, submits that Nathan Wareing is a happy child who enjoys friends and school. Defendant suggests that with appropriate services, Nathan should be able to live independently with little assistance and that, at all events, his pre-injury potential only fell in the low-average range. Defendant concluded that to the extent that a damage award is made at all, noneconomic damages should amount to $500,000.00.

██ 66. Having carefully considered the evidence and weighed the credibility of the witnesses, the Court concludes that an award of one million five hundred thousand dollars, *$1,500,000.00,* in noneconomic damages is warranted and appropriate in this case. As was the case in the *Muenstermann* and *1st of America Bank* cases, which awarded $800,-000.00 and $2,000,000.00 respectively in noneconomic damages, the Court was presented with evidence of a profoundly and permanently neurologically impaired child whose deficits leave him intellectually, socially, and functionally limited. The weight of the evidence suggested that, although a happy kid who is active and attempts to function within a normal range in his peer group, Nathan Wareing will be forever limited by the brain injury he suffered. The evidence of Nathan's growing awareness of his limitations and increasing frustration is further indication of the suffering that Nathan has, and will continue to endure as his neurological deficits leave him further and further behind his age group.

██ In this case, that Nathan Wareing did not testify presents no impediment to an award of noneconomic damages. *Curlender v. Bio–Science Laboratories,* 106 Cal.App.3d 811, 165 Cal.Rptr. 477, 489 (1980) (stating that "[i]n California, infants are presumed to experience pain and suffering when injury has been established, even if the infant is unable to testify and describe such pain and suffering"). There was significant evidence presented by Plaintiff as to the nature and extent of Nathan's injuries and deficits. These again, have left him with extremely severe problems in terms of intellectual and cognitive ability, speech and language, social skills, and functional life skills. Perhaps one distinguishing feature of this case from the *Hill* and *Fortman* cases, which awarded $3 million and $6 million in noneconomic damages respectively, is that while Nathan has some motor difficulties, his physical abilities are largely within the normal range. The children in the *Hill* (psychomotor retardation leaving child unable to feed or to toilet train) and *Fortman* (paraplegic) cases were profoundly impaired physically as well as severely brain damaged. Thus, based on an evaluation of similar cases and the measure of noneconomic damages awarded, as well as pursuant to an independent evaluation of the record evidence, the Court concludes that an award of one million five hundred thousand dollars, *$1,500,000.00* is reasonable.

Accordingly, based on the foregoing findings of fact and conclusions of law, the Court hereby awards the following in damages:

| | |
|---|---|
| Past expenses | $16,000.00 |
| Future Support Care | $1,401,166.00 |
| Lost Earning Capacity | $698,461.00 |
| Noneconomic Damages | $1,500,000.00 |
| TOTAL | $3,615,627.00 |

Thus, based upon the evidence and arguments presented at trial, it is hereby

ORDERED AND ADJUDGED that Final Judgment is entered for Plaintiff and against Defendant in accordance with the Findings of Fact and Conclusions entered herein.

DONE AND ORDERED.